**UNITED STATES of America,**
**Plaintiff,**

v.

**WESTMORELAND MANGANESE COR-PORATION et al., Defendants.**

**White River Distributors, Inc., et al.,**
**Intervenors.**

**Civ. A. 238.**

United States District Court
E. D. Arkansas, N. D.

July 30, 1955.

Second Opinion Sept. 23, 1955.

Osro Cobb, U. S. Atty., G. Thomas Eisele, Asst. U. S. Atty., and Gerland P. Patten, Special Asst. to the U. S. Atty., for plaintiff.

M. F. Highsmith, Batesville, Ark., Goodwin & Riffel, Shields M. Goodwin, Little Rock, Ark., for defendant, Westmoreland Manganese Corp.

W. D. Murphy, Jr., and J. J. McCaleb, Batesville, Ark., for Jeffery Lumber Co., Ira Sherrill, Padgett Lumber Co., General Steel Products Co., Latrobe Const. Co., and Choctaw, Inc., all lien claimants, and also for Koppers Co., Inc., Firestone Tire & Rubber Co., Donley Pipe & Supply Co., Bituminous Casualty Corp., Batesville Truck Lines, Inc., Westinghouse Electric Supply Co., Central Scientific Co., Continental Gin Co., Trans World Airlines, Inc., Carnegie Institute of Technology, Transall, Inc., and Fisher Scientific Co., judgment creditors, and also for Cummins Diesel Sales Corp., Southwestern Bell Tel. Co., The Todd Company, Inc., and Industrial Electric & Supply Co., common creditors.

Catlett & Henderson, E. DeMatt Henderson, Little Rock, Ark., for Bragg's Electric Const. Co., a lien claimant.

Charles F. Cole, Batesville, Ark., for Gardner-Denver Corp., a judgment creditor.

Barber, Henry & Thurman, A. L. Barber, E. A. Henry, Little Rock, Ark., for Mill & Mine Supply Co., Crow-Burlingame Co., and Arkansas Foundry Co., lien claimants, and also for Crane Company and B. F. Goodrich Co., common creditors.

Townsend & Townsend, A. E. Townsend, Jr., Little Rock, Ark., for White River Distributors, Inc., White River Oil Co., and Batesville Equipment Co., common creditors.

Mahaffy, Smith & Williams, W. A. Eldredge, Jr., Little Rock, Ark., for Clark Equipment Co., a judgment creditor.

Luke Arnett, Little Rock, Ark., for C. R. Thornbrough, Commissioner of Labor of the State of Arkansas, a tax claimant.

LEMLEY, District Judge.

### Statement

This litigation, the record in which is voluminous, had its origin in a contract entered into between the plaintiff, United States of America, and the principal defendant, Westmoreland Manganese Corporation, under the terms of which the Government agreed to advance Westmoreland almost four million dollars for the purpose of acquiring mineral lands in Independence and Izard counties, Arkansas, for the construction thereon of a washing and concentrating plant for manganese ore, and for working capital for the operation of such plant, the output of which was to be sold to the Government. The parties commenced performance under the contract, and the Government advanced to Westmoreland nearly three million dollars for the purposes aforesaid, repayment of which was secured by a real estate and chattel mortgage and supplement thereto, covering the Westmoreland properties already existing and those to be thereafter acquired, dated May 22, 1952. On October 29, 1953, the Government, acting under the terms of an amendment to the contract, dated April 2, 1953, terminated said contract, and thereafter commenced this action to recover judgment for the amount of its advances and to foreclose its mortgages, which action was resisted by Westmoreland. At the time the contract was terminated, Westmoreland was indebted not only to the Government, but also to other creditors who had supplied to it services and materials during the life of the contract; the amount of the claims of creditors, other than the Government, exceed $370,000. Some of those creditors were made parties defendant by the Government, and others intervened herein, all claiming that for various reasons their claims were superior to that of the Government.

It is obvious from the foregoing that in order to dispose of the case we were required to decide two basic controversies, namely the controversy between the Government and Westmoreland as

to whether or not the former was entitled to foreclosure, and the controversy between the Government and the other creditors relative to priority of claims. After a lengthy trial we announced from the bench on June 30, 1955, that we were satisfied that the Government was entitled to foreclosure as against Westmoreland, and that we would prepare and file a formal memorandum relating to that controversy, which was subsequently done; we did not, at the time, announce any decision as to the controversy between the Government and the other creditors which, at the time, was still being briefed; and in the memorandum which we filed relating to the issues between the Government and Westmoreland we stated that should it become necessary for us to pass upon the issues between the Government and the other creditors, such issues would be made the subject of a separate memorandum. As it developed, we were called upon to pass upon such issues, and on September 23, 1955, we filed a second memorandum dealing therewith. In addition to those two memorandums we have found it necessary on several occasions in the course of this litigation to prepare letter-opinions disposing of various motions filed by Westmoreland.

For purposes of publication the two formal memorandums above referred to have been combined in one document. The memorandum dealing with the controversy between the Government and Westmoreland appears below under the heading, "First Memorandum"; and that dealing with the issues between the Government and the other creditors appears under the heading "Second Memorandum."

## First Memorandum

This cause was tried to the Court, and the taking of testimony was completed on June 29, 1955. On June 30, 1955, the Court read a prepared statement announcing its decision and making its ultimate findings of fact and conclusions of law with respect to the issues between the plaintiff, United States of America, and the defendant, Westmoreland Manganese Corporation; that statement was signed by the Court and filed as a part of the record in the case and a copy thereof is attached to this memorandum as an appendix hereto.[1] In the course of said statement, it was said that a formal memorandum bearing upon those issues would be filed, which memorandum follows:

The plaintiff, hereinafter called the Government, brought this action against the defendant, Westmoreland Manganese Corporation, hereinafter called Westmoreland, to foreclose a certain real estate and chattel mortgage and supplement thereto, executed by Westmoreland on May 22, 1952, for the purpose of securing advances made to the latter by the plaintiff pursuant to a contract entered into between the parties on April 7, 1952.[2] Under the terms of that contract, Westmoreland undertook to construct and put into operation in Independence County, Arkansas, a gravity concentration plant for the processing of manganese ore to be sold to the Government at stated prices over a period of years; and the Government undertook to advance funds to Westmoreland to enable it to carry out its undertakings, such moneys to be repaid over the life of the contract.[3] It is the theory of the Gov-

1. We deem it unnecessary to set out the statement above referred to because the contents thereof are substantially included in the formal memorandum.

2. Various other creditors of Westmoreland were brought into the case as defendants, and still others have intervened herein. This memorandum, however, is limited to the issues between the Government and Westmoreland solely. The issues between the Government and the other creditors involve the construction and application of the Arkansas statutes relating to materialmen's and miners' liens and are quite complicated; should it eventually become necessary to decide those issues, they will be made the subject of a separate memorandum.

3. The governmental agency concerned was the Defense Materials Procurement Administration, hereinafter called the D.M.P.A.

ernment that by virtue of the provisions of an amendment to the original contract, which amendment was executed on April 2, 1953, it is presently entitled to judgment against Westmoreland for the amount of its advances, plus interest and to a foreclosure of its mortgage and the supplement thereto. Westmoreland contends, on the other hand, that said amendment is void because of lack of consideration and because it was procured by fraud, and that the Government's complaint should be dismissed.

The original contract between the parties provided that Westmoreland should acquire certain mineral lands in Independence and Izard Counties, Arkansas, should construct and put into operation a plant for the processing of manganese ore, and over a period of years should sell to the Government at stated prices at least 264,000 long dry tons of such ore for stockpiling purposes. Westmoreland obligated itself to complete the plant and to be in production as soon as possible, and agreed further that by the end of a year from the date of the contract, that is to say, by April 7, 1953, its production would be at the average rate of 2,000 long dry tons per month. In order to assist Westmoreland in carrying out its undertakings the Government agreed to advance funds for land acquisition, for the acquisition and construction of new facilities, and for working capital the maximum sum of $3,807,250.00, which, as indicated, was to be repaid over the life of the contract and not later than January 1, 1960. Of the total sum just mentioned $418,600 was to be used for land acquisition; $2,788,650 was to be used for the acquisition and construc-

tion of the facilities;[4] and $600,000 was to be used for working capital.

The mortgage provided that should Westmoreland make default in the performance of any of its obligations thereunder or under the contract, and should the default remain unremedied for sixty (60) days after notice thereof, the Government should have the right to declare all advances made by it under the contract to be due and payable and to foreclose its mortgage.

Subsequent to the execution of the contract and mortgage, the parties entered upon the performance of their agreement, and the Government advanced to Westmoreland the sum of $2,877,-006.50 over a period extending from May 22, 1952, through February 14, 1953. About February 21, 1953 the Government refused to countersign certain checks drawn by Westmoreland against its special bank account in one of the Batesville banks, and by order of W. S. Stringham, the Company's general manager, construction operations were brought to a halt and have never been resumed.[5] At the time of the shut-down the plant was about eighty or eighty-five percent complete, and it had been determined that it could not be completed with the moneys that the Government had agreed to advance for that purpose, and that approximately $545,000 more would be needed; at that time approximately $900,000 of the original $3,807,-250 called for by the contract and representing the unexpended portion of the funds earmarked for construction (including the $155,000 allotted for the second slime pond) and for working capital

4. Of this sum $155,000 was earmarked for the construction of a "second slime pond," should it be determined that such a pond should be constructed. A "slime pond" is a pond utilized for the deposit of waste products and for the impounding of ore from which the desired manganese has not been entirely extracted by the metallurgical process in use at the mine, the idea being that possible future improvements in metallurgy would enable such ore to be profitably re-worked.

5. The evidence is in conflict as to what brought about the shut-down; Mr. Stringham testified that it was due to the Government's refusal to countersign the checks as a result of which Westmoreland was unable to pay its employees. The Government's evidence is to the effect that prior to its refusal to countersign the checks Mr. Stringham had ceased construction operations on his own initiative. The view that we take

remained undisbursed.[6] There was never any production by the Company, and no part of the moneys advanced by the Government has ever been repaid.

On March 6, 1953, Westmoreland made formal application to the Government for an advance of $545,800 in addition to the approximately $900,000 above mentioned, and in its application recited that it was unable to raise the additional funds needed by "private financing." On April 2, 1953, while that application was pending, and just five days before Westmoreland was required under the terms of the original contract to have its plant completed and to be in production at the specified rate, the parties, after a series of conferences between their respective representatives, agreed to and executed the amendment to that contract heretofore mentioned, which amendment was formally designated, and will hereinafter be referred to as "Amendment No. 1."

That amendment, after reciting that the facilities had not been completed and that the production of manganese ore would not be commenced within the period provided in the contract, and after further reciting that Westmoreland was without funds to complete the facilities and that it had currently outstanding various obligations which it was unable to meet, provided: First, that the facilities should be placed on a temporary standby basis, and that all operations should cease, except that the mineral drilling program on the Company's properties should be continued, the expense of putting the properties on such standby basis and of maintaining them thereon and of carrying on the drilling program to be met by funds to be made available by the Government out of moneys to be provided under the terms of the original contract. Second, that the Government would advance to Westmoreland out of funds allotted pursuant to the original contract sums not to exceed $29,080.42, for the purpose of paying certain of its outstanding obligations, provided that Westmoreland would raise $15,000 in matching funds. Third, that notwithstanding any provisions to the contrary contained in the original contract or mortgage the Government should have the right to terminate the contract "at any time in the future up to commencement of production upon determination by the Government that termination of the Contract is in the best interest of the Government"; and that "the Contractor shall take no legal action to prevent such termination of the Contract by the Government, and disclaims any and all recourse by reason of such termination by the Government." Fourth, that the 60-day notice provision, and any other moratorium provisions contained in the original mortgage should be of no force and effect, and that in the event of termination of the contract "the Contractor shall, on demand of the Government, grant the Government immediate possession of the facilities. * * * *"

After the execution of Amendment No. 1, both parties performed according to its terms. Westmoreland raised and deposited in the bank at Batesville the $15,000 that it was required to put up, and the Government advanced funds to discharge certain of Westmoreland's obligations, principally labor claims. The drilling program referred to in the amendment was carried out and paid for with funds advanced by the Government, and the Government likewise expended nearly $20,000 to defray the expenses incident to maintaining the facilities between the date of the amendment and the date of final termination. In all, the Government advanced in reliance upon Amendment No. 1 over $75,000.

A decision by the Government on Westmoreland's application for additional funds was withheld during the spring and early summer of 1953 pending receipt and consideration of a report from

of the case renders it unnecessary for us to resolve this conflict.

6. It is conceded by Westmoreland that the Government was not required to advance funds earmarked for working capital for construction purposes.

the Southwestern Engineering Company bearing upon the metallurgy intended to be employed at the plant.[7] That report, a copy of which was supplied to Westmoreland, turned out to be unfavorable; but before it had been acted upon by the Government, Westmoreland on August 24, 1953 withdrew its said application, stating in substance that if the Government would advance to it without restriction as to use all of the funds contemplated by the original contract and remaining undisbursed, including the $155,000 earmarked for the second slime pond and the funds allotted for working capital, so as to enable it to pay its creditors and complete the facilities, it would raise from other sources such working capital as might be necessary.[8] That proposition was thereafter considered by a panel of experts convened by the Government and was turned down. Thereafter on October 29, 1953, the Government, acting under Amendment No. 1, terminated the contract and demanded possession of the facilities. That demand having been refused, this suit was filed on January 8, 1954.

In its original complaint the Government relied for foreclosure solely on

7. Prior to the execution of Amendment No. 1 Westmoreland had been advised that its request for additional funds could not be acted upon until the results of the drilling program referred to in the Amendment were known and until the metallurgical report of Southwestern Engineering Company had been received. In that connection it should be said that both Westmoreland's ore reserves and its proposed metallurgy had been questioned by Mr. James S. Wroth, a mining expert in the employ of the Government, in December of 1952, and his doubts had been communicated to the D.M.P.A. resulting in the employment of Southwestern Engineering Company to make certain tests of samples of ore to be selected under Mr. Wroth's supervision.

8. While the attorneys for Westmoreland and some of the latter's witnesses talked a good deal in the course of the trial about Westmoreland being able to raise necessary funds itself had it been given an opportunity to do so by the Government, it is clear from the evidence that Westmoreland never contemplated raising the money necessary to remedy the overrun in the construction category and proceeding under the original contract. All of its thinking on the subject involved the Government releasing to it all of the remaining undisbursed funds, including working capital funds and the sum allocated for the second slime pond, for use in finishing the plant; Westmoreland felt that if the Government would do that, then it could go out and raise working capital from private sources by selling additional stock or otherwise. At the time Westmoreland withdrew its application for the $545,000 which has been mentioned, it had more or less of a commitment from a Mr. Potashnick to advance about $300,000 of working capital

provided that the Government would release all of the undisbursed funds, without restriction as to use, and provided that all of the Government's money was spent first. For some reason, however, the Government was never advised of Mr. Potashnick's proposition. We do not stop now to discuss whether or not Westmoreland could have actually raised any substantial amount of money from private sources, although we doubt it; suffice it to say that the Government had no reason to believe that Westmoreland could do so. In that connection it will be remembered that the application of March 6 recited that the needed funds could not be obtained by means of private financing; earlier than that at a meeting held on February 16, 1953 Mr. Lishman, one of the Washington attorneys employed by Westmoreland, had stated that "it would be almost impossible for the company to sell stock in view of the severe limitations of return imposed under Government contract." Moreover, around May 5, 1953, after Amendment No. 1 was executed, Mr. John G. Ford, Director of Contract Negotiations for the D.M.P.A., who, along with his deputy, Mr. Arthur L. Sherman, had been charged with the responsibility of administering the contract, had written Westmoreland suggesting that if Westmoreland could arrange to complete the project by means of private funds, the Government would be glad to discuss a new contract. Westmoreland never acted upon that proposition, however, and the only thing approaching a definite arrangement that Westmoreland ever made was that with Potashnick which, as stated, was never communicated to the Government. The whole tenor of Westmoreland's representations to the Government was that the latter was its sole source of additional money.

Amendment No. 1, it being alleged that subsequent to the execution of that amendment "the plaintiff determined that a termination of the contract was in the best interest of the government, terminated the same, and on or about the 29th day of October, 1953, notified the defendant * * * of the said termination." On May 27, 1954 Westmoreland filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted, its theory being that Amendment No. 1 was void for lack of consideration, and that since the Government's action was predicated solely upon that amendment, the complaint should be dismissed.

Before that motion had been acted upon, the Government amended its complaint so as to allege, as alternative grounds for foreclosure, that Westmoreland was in default under its contract in a number of respects,[9] and that by reason of such defaults the plaintiff was entitled to foreclosure irrespective of the validity of Amendment No. 1. Thereafter Westmoreland renewed its motion to dismiss, taking the position that foreclosure could not be had on the basis of defaults on its part because the Government had never given the notice of default required by the original agreement. On October 27, 1954, the Government again amended its complaint so as to allege, among other things, certain defaults with respect to which no notice was required by the original agreement.[10] Westmoreland again renewed its motion to dismiss, which motion was overruled on January 10, 1955, and thereafter Westmoreland answered.

In its original answer Westmoreland denied that it was in default in any of the respects relied upon by the Government, and asserted that the Government had itself breached the contract by refusing to advance funds after the middle of February, 1953 thus forcing a cessation of construction and preventing completion of the plant and commencement of operations within the time contemplated by the contract. It was further alleged that Amendment No. 1 was void for want of consideration; that Westmoreland had not been given any notice of default and had not been afforded the opportunity to remedy its defaults, if any, within 60 days after notice thereof, as provided by the original mortgage, and that the giving of such notice was a condition precedent to foreclosure under said original mortgage. In an amendment to its answer Westmoreland alleged that the Government by its asserted breach of the original contract had damaged Westmoreland in a sum in excess of that advanced to it, and prayed that its claim for damages be offset against the claim of the Government, should it be determined that the

**9.** The defaults alleged were as follows:

(a) That Westmoreland had failed to complete the facilities and to commence production within the time provided in the contract.

(b) That it had failed to keep proper books and records.

(c) That it had failed to provide accurate and proper reports.

(d) That it had failed to provide satisfactory and competent management, as required by the contract.

(e) That it had failed to present accurate and realistic cash requirements on monthly "flow sheets".

(f) That it had expended funds and incurred obligations in an amount exceeding that contemplated under the contract and had improperly classified expenditures and had misapplied funds.

In connection with the alleged "misapplication" of funds, it should be said that the Government has never claimed that any of the officials or employees of Westmoreland embezzled any money or that their activities were tainted with fraud, at least as far as the Government was concerned; the claim made by the Government was that funds had been "misapplied" in that moneys earmarked for working capital had been expended in building a road on the properties, the expense of which was not properly chargeable to working capital, and had also expended working capital funds for the purchase of certain equipment and material.

**10.** Those alleged defaults were that Westmoreland had failed to pay certain taxes and had also failed to keep the premises adequately insured.

Government was entitled to foreclosure notwithstanding its alleged breach of contract.

With the issues thus drawn, the trial of the case commenced on March 14 of the current year; and after the trial had proceeded for a number of days, the Government conceded that it had not given the notice required by the original mortgage, and that if Amendment No. 1 was invalid, the suit was prematurely brought. At about the same time, Westmoreland conceded that its claim of offset could not be considered here because it had not complied with the provisions of 28 U.S.C.A. § 2406.[11] While Westmoreland argues to the contrary, we are convinced that the concessions just mentioned narrow the issues in this case down to one, namely, the validity of Amendment No. 1. If that Amendment is valid, then the Government has the right to foreclose; on the other hand, if it is invalid, then this suit should be dismissed as having been prematurely brought. We find it unnecessary to decide whether the original contract was breached by Westmoreland or whether it was breached by the Government, and we make no finding on that issue, although we heard evidence with respect thereto as bearing upon whether or not there was consideration for Amendment No. 1. In this connection it will be recalled that the Government's original complaint was based solely on Amendment No. 1 which eliminated the notice requirements of the original mortgage; when the Government amended its complaint so as to allege alternative grounds for foreclosure under the original contract and mortgage, Westmoreland contended that the suit could not be maintained because no notice of default had ever been given. The Government has now, in effect, admitted that Westmore-

land was correct in that contention, and has returned to its former position, and it concedes that if Amendment No. 1 is invalid, the action cannot be maintained, regardless of whether Westmoreland was in default or not. Since Westmoreland has admitted that its claim for a set-off cannot be considered here, we do not believe that it can complain of the Government's concession or insist that we pass upon any issues relative to default; and we do not think that any useful purpose would be served by doing so. Moreover, our decision not to pass upon such issues leaves them open to be passed upon in such appropriate proceedings, if any, as Westmoreland may institute before a proper tribunal in connection with its claim for damages, without either side being embarrassed or prejudiced by unnecessary findings here.

Westmoreland's attack on Amendment No. 1 was originally based solely upon its contention that said amendment was not supported by consideration; as the trial progressed, however, insinuations began to creep into the record to the effect that the execution of said amendment had been procured by fraudulent misrepresentations on the part of the Government officials charged with the administration of the contract; and on April 20 we called on counsel for Westmoreland to state categorically whether or not they contended that the amendment was so procured. After consultation and consideration, they replied that Westmoreland did so contend. Thereupon, on motion of the Government, we adjourned the hearings in order to permit Westmoreland to amend its answer so as to set out specifically the alleged fraudulent representations upon which it relied, and to state definitely when, where and by whom such alleged representations were made; the adjournment was for the further purpose of al-

11. The statute just mentioned provides that: "In an action by the United States against an individual, evidence supporting the defendant's claim for a credit shall not be admitted unless he first proves that such claim has been disallowed, in whole or in part, by the General Account-ing Office, or that he has, at the time of the trial, obtained possession of vouchers not previously procurable and has been prevented from presenting such claim to the General Accounting Office by absence from the United States or unavoidable accident."

lowing the Government officials involved to prepare to meet such charges of fraud or bad faith as might be made against them. In due time Westmoreland did amend its answer so as to allege fraud, and while the Government did not choose to file a formal response to that amendment, it vigorously contends that the allegations contained therein are without merit or substance. It will thus be seen that the issue as to the validity of Amendment No. 1 involves two questions: namely, was that amendment supported by consideration, and, if so, was it procured by fraud.

With regard to consideration, the applicable principles of law are well settled and may be briefly stated: Parties who are capable of making a contract in the first instance are likewise capable of varying or modifying its terms, and their mutual agreements or undertakings in that connection furnish consideration for the modification; moreover, consideration for a contract may be found not only in benefits moving to the promisor (in this case Westmoreland), but also in legal detriment suffered by the promissee (here the Government) in reliance upon the agreement. Another principle of contract law, invoked by Westmoreland, is that ordinarily an undertaking by a party to do something that he is already obligated to do is not sufficient to constitute consideration; that general rule, however, is subject to an exception in cases where "the very existence of the duty is the subject of honest and reasonable dispute." 17 C.J.S., Contracts, § 110.[12]

Applying the foregoing principles to the evidence in the instant case we are convinced that there was consideration for Amendment No. 1 in that Westmoreland derived benefits from its execution, some of which will be presently mentioned, and also in that the Government suffered legal detriment in

that, in reliance upon the amendment, it took certain actions which it was contending in good faith that it was not required to take, and in that it refrained from taking steps on the anniversary date of the contract, April 7, 1953, under the original contract and mortgage to terminate the agreement, which steps would have been taken but for the execution of the amendment.

Immediately prior to the execution of the amendment it was obvious that, regardless of fault, Westmoreland would not be able to complete the facilities and commence production within the time prescribed by the original agreement, or to do so at all within the limits of the funds which the Government had agreed to advance for that purpose. And while Westmoreland contends that the Government did not consider it to be in default at that time, we find from the evidence that such was not the case, and that the Government, either rightly or wrongly, was taking the position that default existed, or, at the very least, would exist just five days later; and although it is true that the Government never at any time prior to the execution of Amendment No. 1 gave Westmoreland any formal "notice of default" under the original mortgage, it is clear to us that the Government's position was brought home to Westmoreland, and that the latter knew that unless Amendment No. 1 was signed, steps would be taken five days later looking to a termination of the contract and foreclosure of the mortgage.

In that connection the record reflects that on March 17, 1953 Mr. Sherman addressed a memorandum to Mr. A. H. Greene, General Counsel for the D.M. P.A., advising him that Westmoreland would not be able to complete the facilities and be in production by April 7, and requesting advice as to whether or not notice of default should be given on that date.[13] The General Counsel's office ad-

---

12. The general rule and the exception thereto were mentioned in our letter opinion overruling Westmoreland's mo-

tion to dismiss the complaint as amended.

13. The last paragraph of Mr. Sherman's memorandum is as follows: "Since the

vised Mr. Sherman that such notice should be given. On March 20, 1953, Mr. Ford wrote to Mr. E. P. Blough, Chairman of the Executive Committee of Westmoreland's Board of Directors, urging him to expedite the furnishing of the complete balance sheet which the Government had required in connection with its consideration of Westmoreland's request for an immediate release of funds sufficient to meet its delinquent payrolls; in the course of the letter it was said:

"Despite the fact that the balance sheet was requested several days ago, and had been requested repeatedly prior to that time, it has not been forthcoming and as yet we are not informed of the true financial condition of your Company.

"This office would be under any circumstances very much concerned with the situation as we understand it to exist and as described briefly in this letter, but in view of the fact that under the above Contract your corporation is required by April 7, 1953 to be in production at the rate of 2,000 long tons per month of manganese ore *we are faced with a problem so serious as to require immediate action to protect the Government's interest.*

"We ask that you inform us by return mail what has been accomplished to correct the precarious condition of your corporation as your counsel have explained it to us, and by what means and when you expect to do the things necessary to remove *the apparent imminent threat to your ability to continue operations under this Contract.*" (Emphasis added.)

On March 24, 1953, a meeting was held in Washington attended by representatives both of Westmoreland and of the Government.[14] A memorandum of what transpired at that meeting was prepared by Mr. Lishman; that memorandum states, among other things: "Concerning the April 7, 1953, the date when under its contract Westmoreland *is required to commence production,* Mr. Ford stated that DMPA had no disposition at this time to exercise the right of cancellation *if there is any other reasonable means of working out the difficulties caused by mismanagement and laxity on the part of the Board of Directors.*" (Emphasis added.) Moreover, the first draft of Amendment No. 1, which draft was prepared by Mr. Koontz of the office of the General Counsel of the D.M.P.A., contained an express admission of default on the part of Westmoreland; that in itself was sufficient to put Westmoreland on notice of the Government's position, and while it is true that the Government did not insist upon the inclusion of such an admission in the final draft of the amendment, it does not appear that at any time the Government receded from its position that default in fact existed.

Not only were Mr. Ford's letter of March 20, his statements of March 24, and the contents of the first draft of Amendment No. 1 sufficient to put Westmoreland on notice as to the Government's position, but it further appears from the evidence that the responsible directors of Westmoreland did in fact understand that position, and knew that unless Amendment No. 1 was signed the Government would not advance any more money and would take steps to terminate and foreclose. As stated, the amendment was executed on April 2, 1953, and the directors who had authorized its execution desired to secure the ratification of the stockholders. A stockholders' meeting was called for the latter part of April, and on April 10 Westmoreland's Washington lawyers, Knox, Mat-

contractor will be in default as of April 7, 1953, please advise whether, in order to protect the Government's interest, it will be necessary to serve an appropriate notice of such default on the above date."

14. That meeting was attended by Messrs. Ford, O'Dyer and Koontz, representing the Government, and by Mr. Highsmith, Mr. Stringham, Mr. Lisowitz and Mr. Lishman, representing Westmoreland.

thews & Lishman, wrote a letter to Mr. M. S. Morrison, one of the directors, copies of which were mailed to the other directors, the pertinent parts of which are as follows:

"We strongly believe that the stockholders' meeting should be held on April 21. It would be advantageous if, before that date, the Board of Directors could furnish to the stockholders a report summarizing the recent developments which resulted in the corporation's being *compelled* to execute Amendment No. 1, to its April 7, 1952 contract with the Government. Some of the stockholders relied upon the April 7, 1952 contract when they made their investments. If the Directors are unable to furnish a complete report to the stockholders in advance of the April 21 meeting, the notice should be sufficiently broad to indicate the financial difficulties of the company and the events leading up to Amendment No. 1 * * *. Postponement of the meeting in our opinion should not be made merely to accommodate the convenience of any individual member of the Board because, as you know, the situation is one *of critical emergency for the continued existence and well being of the company* * * *." (Emphasis added.)

Thereafter the Executive Committee of Westmoreland's Board mailed a memorandum to all of the stockholders reviewing events that had transpired since September 30, 1952, the date of the last annual meeting, and leading up to and including the execution of the amendment, and urging attendance at the April 21, meeting. After referring to the criticisms that the Government had made of the corporate management since November of 1952, this memorandum stated:

"Subsequently, DMPA suspended our funds and it became necessary for the Board of Directors on April 1, 1953 to agree to amend our original contract with the Government.

Among other things, Westmoreland granted the Government the unqualified right to terminate the contract at any time up to the commencement of production and we waived the sixty-day period contained in the mortgage instrument * * *; we also agreed to return to the Government the unexpended balance of the funds advanced to us. In return the Government agreed to permit payment for the continuance of the mineral drilling program and the costs for maintaining the facilities in a standby state; the Government also agreed to pay part of certain outstanding accrued obligations, the balance of which was raised by money loaned to Westmoreland by several stockholders. Many other bills remain unpaid because of lack of funds.

"We require approximately $546,-000 additional to complete our project and an application for such additional money is pending with DMPA. No action will be taken apparently until Southwestern Engineering Company submits its findings based on seven samples taken of our manganese ore. These results are not expected before May 1, 1953.

* * * * * *

"The problems confronting us are great, but we hope not insurmountable. The Executive Committee and the Board of Directors have freely given much of their time and energy in an effort to calm the rocking boat so we may accomplish our goal—the production of manganese * *."

The meeting was held on April 21, and the action of the Board in agreeing to Amendment No. 1 was ratified by the vote of all of the stockholders present, except Mr. Henry Holloway who objected strenuously and filed as part of the record of the meeting a long memorandum setting forth his views. The minutes of the meeting, which were introduced in evidence, read in part as follows:

"Mr. Blough stated the first order of business was to receive a report from the Board of Directors and to consider the amendment to (the original contract). He stated the Government cut off advances and at present building was at a standstill. We were forced to raise some $15,000 to pay outstanding payrolls, and it would be necessary to make a new application for some $545,000 to complete construction and get into production. In the meantime the Government is reviewing the metallurgy and will not act on any application until the new results are known. It is, however, willing to advance money to continue the drilling program because the mill further advanced than the drilling. DMPA has recommended we do four things:

" (1) Refund the present bank balances to the Government. This has been done.

"(2) Enter into a new agreement. This has been done. *DMPA would do nothing further until we had done that.* (Emphasis added.)

\* \* \* \* \* \*

"Mr. Specht read Amendment No. 1. \* \* \*. Under the amendment we waived the 60 day foreclosure clause in our mortgage, we agreed that if the Government decided to foreclose we would not get a court order or issue any restraint, but we did insert a clause to the effect that we can demand an accounting and we can sue the Government. \* \* \*."

Entirely aside from the foregoing, Westmoreland knew that it could not complete construction within the time limited by the original agreement or without further funds from the Government, and it also knew that its management had been seriously criticized by the Government; how under such circumstances the directors could have seriously believed that they were in good standing with the Government with respect to their contract is hard to conceive; and we do not consider that they did so believe.

In support of its position that the Government did not consider it in default as far as the completion deadline was concerned, Westmoreland relies on a statement that it claims Mr. Sherman made in the course of a meeting held on December 3, 1952, to the effect that Westmoreland would not be held to the April 7, 1953 date. It is clear that at that meeting some discussion was had as to the completion date, Westmoreland having had some difficulty in securing steel.[14.] Accepting as true the testimony of Mr. Glen Thiele, who was one of Westmoreland's directors, and who impressed us as an honest and reliable witness,[15] it seems that Mr. Blough asked Mr. Sherman about the deadline, and that the latter replied that the Government had always recognized that contingencies might arise, and that a steel shortage would be considered as a valid excuse for not meeting the deadline. That statement of Mr. Sherman must be considered in relation to Paragraph 9 of the original contract, which provided that Westmoreland would be entitled to an extension of time in the event that completion was delayed from any one or more of a number of causes, including inability to obtain material due to "priority or allocation requirements or other acts of the Federal Government," but which also required that "prompt notice" of such delay should be given to the Government. When Mr. Sherman's statement is evaluated in the light of that contract provision, we think that it amounted to no more than a statement to the effect that if Westmoreland saw that completion of the project would be

14. At that time the $545,000 overrun had not been discovered.

15. Two other directors of Westmoreland who testified on the point now in question gave their versions of Mr. Sherman's statement in response to highly leading questions, a circumstance which in our eyes seriously detracted from the credibility of their testimony, and that was called to the attention of counsel at the time.

914

delayed because of a steel shortage, it would be entitled to the benefit of the provision just mentioned, provided that it gave proper notice. We do not believe that Mr. Sherman in making that statement intended thereby to waive the completion deadline, an action which would have been beyond the scope of his authority, and we do not believe that the Westmoreland representatives, including Mr. Lishman, who was present, so construed it at the time. In view of the obvious advantage to Westmoreland of a release from the April 7 deadline, it is inconceivable to us that had the Westmoreland representatives felt that such a release had been given, they would not have taken steps to get it confirmed in writing. Aside from that, however, and irrespective of the Government's attitude in December with regard to the April deadline, the fact remains that when Amendment No. 1 was executed, the Government was unquestionably contending that Westmoreland was bound by that deadline. Moreover, the question of a steel shortage passed out of the picture entirely in January when Mr. Blough wrote to Mr. Sherman advising that all necessary steel had been obtained; indeed as late as Mr. Sherman's visit to the plant in February after the overrun had been discovered but prior to the shut down, Mr. Stringham was satisfied that the production schedule could be met; and it is clear that Westmoreland's failure to complete the plant and achieve production by April 7 was not due to any shortage of material.

While some of Westmoreland's witnesses testified that the company gained no benefit from the execution of Amendment No. 1, such testimony merely reflects the opinions of those witnesses, which opinions are not supported by the evidence. As had been stated, had Amendment No. 1 not been signed, the Government would have taken steps to terminate and foreclose on April 7, which action would have, from a practical standpoint, killed the project regardless of how the relative rights of the parties might have been ultimately determined in subse-

quent litigation. By Amendment No. 1, however, the parties formally agreed that the plant should be put in a standby condition pending the Government's consideration of Westmoreland's application for more money, that the expenses of maintaining the facilities in that condition would be paid with moneys advanced by the Government, and that the Government would finance the drilling program mentioned in the amendment. In reliance upon that amendment the Government refrained until October 29 from giving any notice of termination, and, as indicated, advanced very substantial sums of money on the strength of the amendment. The effect of the Government's refraining from taking steps to terminate on April 7 was to keep the project alive for almost seven months, which, in itself, was of obvious advantage to Westmoreland. Furthermore, during that period of time Westmoreland's application for additional funds received serious, and, we are satisfied, honest consideration. Had Amendment No. 1 not been executed, that application would not have been further considered.

It may be conceded, perhaps, that since the contract was finally terminated, Westmoreland did not derive any ultimate benefit from the amendment, but that is not material. Certainly the officials of Westmoreland expected to benefit from the amendment, otherwise they would not have signed it; and as has been seen, it did derive immediate benefit therefrom.

It is argued by Westmoreland in connection with the moneys advanced to pay laborers and to carry on the drilling program that the Government was already obligated to make such advances, and that it did not change its position when it did so. This argument overlooks the fact that the Government at the time was taking the position that it was not required to advance any more money to Westmoreland for such purposes and it was not until Amendment No. 1 was executed that it was willing to do so.

Without going into the tangled question of whether the obligations incurred

by Westmoreland to its laborers, and which the Government in February refused to pay, were incurred in violation of the contract or not, the evidence clearly demonstrates that from February on the Government was contending that said obligations were not properly incurred, and that it was not required to advance money for their discharge, although it was willing to consider doing so under certain conditions, including, finally, the execution of Amendment No. 1, and the raising by Westmoreland of $15,000 in matching funds. While it is true that on or about March 24, Mr. Howard I. Young, the Deputy Administrator of the D.M.P.A., who was the superior of Mr. Ford and of Mr. Sherman, stated in effect that he wanted to see the laborers paid, we do not think that the representatives of either the Government or of Westmoreland interpreted his statement as amounting to a categorical order to his subordinates to make such payment in any event since after that statement was made, the Government representatives continued to insist that part of the money be raised by Westmoreland and that Amendment No. 1 be signed, and Westmoreland's representatives acceded to their demands without seeking any further relief from Mr. Young.[16] When the Government finally agreed to advance funds to pay the laborers, it was taking a step that it had theretofore contended it was not required to take, and its agreement under such circumstances constituted consideration for the amendment.

Taking up next the drilling program, the original contract contemplated that drilling should take place on the Westmoreland properties, and moneys were allocated for that purpose. The drilling program envisualized by the original contract, however, was developmental in nature, and it was contemplated that it would be carried out as part of the mining operations of Westmoreland; it was not a program of exploratory drilling, and no moneys had been allocated for such drilling.[17] We find from the evidence in this case that although Westmoreland may have considered that the drilling program contemplated by the amendment was nothing more than development drilling, that program was, from the Government's standpoint, exploratory in nature, and we further find that if it had not been so regarded by the Government, the latter would have been unwilling to finance it; as a matter of fact, the Government would have had no object in financing a program of merely development drilling at a time when no one knew whether or not the plant would ever be completed.

On this phase of the case, the evidence shows that in December of 1952 some question arose in Mr. Wroth's mind as to Westmoreland's ore reserves, and his doubts were thereafter materially increased when he was back on the properties in connection with the taking of samples by Southwestern Engineering Company for use in its metallurgical test work. In the course of this sampling, it developed that the ore body on the West-

16. It may be questioned whether or not Mr. Young in any event had the authority to order the payment of the labor claims irrespective of the provisions of the original contract; the fiscal aspects of the Westmoreland project were administered by the office of the Comptroller of the General Services Administration, who was not directly under Mr. Young's jurisdiction; the Comptroller had taken the position that the claims were not incurred by Westmoreland in accordance with the terms of the original contract, and that they should not be paid.

17. In the strip mining of manganese two types of drilling are involved, namely, ex-

ploratory drilling, undertaken to determine whether or not ore is present in commercial quantity, and developmental or "blocking-out" drilling which is carried on in the course of the mining operations to determine exactly where the ore body lies, and also to determine the barren localities on which overburden may be dumped without the danger of having to remove it at some later date in order to get at the underlying ore. From an accounting standpoint, according to the evidence, the cost of development drilling is properly chargeable to working capital, while the cost of exploratory drilling is not.

moreland properties did not lie in a continuous blanket, as had been supposed, but was very irregular and discontinuous. This discovery caused Mr. Wroth to have very serious doubts as to whether or not enough tonnage could be obtained by the Company to enable it to carry out its contract, and he passed those doubts on to the D.M.P.A., and likewise communicated them to Mr. Stringham; it was his idea that the only way whereby it could be determined whether or not sufficient tonnage existed was to conduct an exploratory program, and since, as stated, the ore body was discontinuous and irregular the drill holes would have to be a good deal closer together than would ordinarily be the case in an exploratory program.

Thus when Westmoreland requested $545,000 in additional money, the officials in D.M.P.A., including Mr. Ford and Mr. Sherman, as a result of Mr. Wroth's reports, doubted that there was sufficient ore in the ground, and they insisted, properly we think, that before Westmoreland's said application was given consideration, it would have to be proved through an exploratory drilling program that there was at least enough ore present to enable the Company to fill its contractual quota for the first year of operation. It is unnecessary for us to determine whether or not the Westmoreland directors personally knew of the Government's doubts, since Mr. Stringham, Westmoreland's General Manager, testified that he knew that Mr. Ford and Mr. Sherman doubted that the ore was in the ground; and, of course, his knowledge would be imputed to Westmoreland.

Westmoreland benefitted from the program in that if it should establish to the Government's satisfaction the existence of a sufficient ore body, it would advance the favorable consideration of its application for more money, and at the same time it would accomplish the blocking out of ore needed during its first year of operation. On the other hand, if the ore was not there, then it was to the best interest of the parties to learn that fact as soon as possible.

In addition to the elements of consideration already pointed out, there is another that should be mentioned: The agreement of the Government to advance funds to maintain the facilities in a stand-by condition was an entirely new undertaking on its part. The original contract required Westmoreland to build the plant and to operate it, and the Government agreed to advance funds for those purposes. It was not originally contemplated that the facilities should be placed and maintained in a stand-by basis, and no money was originally allocated for that purpose.

■ Having shown that there was consideration for Amendment No. 1, we now pass to the question of fraud in its procurement, with respect to which question little need be said. While Westmoreland alleged in substance that Mr. Ford and Mr. Sherman in effect entered into a conspiracy to induce Westmoreland by means of fraudulent representations to give up its right to the sixty day notice of default provided in the original mortgage and to grant to the Government the right to terminate the contract at will and without notice at any time prior to the commencement of production, and that they made false and fraudulent representations upon which Westmoreland relied, those charges are wholly unsustained by the evidence; on the other hand, we are convinced from the evidence that both Mr. Ford and Mr. Sherman are honest and conscientious public servants, and that they dealt fairly and honestly with Westmoreland throughout the life of the contract. Our view with regard to those gentlemen appears to be shared by Westmoreland's officials, Mr. Stringham and Mr. Thiele, both of whom testified that they were satisfied that Mr. Ford and Mr. Sherman were men of integrity, and that they saw no evidence of any fraud or bad faith in their dealings. Furthermore, the evidence shows that on March 30, 1953, just three days before Amendment No. 1

was executed, Mr. Ford, whom it will be remembered was Mr. Sherman's superior, wrote a memorandum to Mr. Tom Lyon, Director of the Domestic Expansion Division of the D.M.P.A., requesting him to review Westmoreland's application for additional funds; the last paragraph of that memorandum affords, in our estimation, almost conclusive evidence of Mr. Ford's good faith, and establishes that so far from undertaking to defraud Westmoreland he was, in fact, seeking to bring about the favorable consideration of its application. That paragraph is as follows:

"The facilities are about 80% completed, and a total of about $2,921,000 has been advanced to date for capital costs, for completion of purchases of the ore body and for working capital. It is obvious that the plant in its present status has little value, and that cancellation of the contract for default, or forcing the Company into bankruptcy will result in loss of the major portion of the Government's investment and will fail to meet the objective of the contract, which is to provide for industry and stockpile purposes a material addition to the current domestic production of manganese concentrate."

In view of the foregoing it follows that Amendment No. 1 is valid, and that the Government is entitled to judgment for the amount of its advances, plus interest and costs, and to a decree of foreclosure with respect to its real estate and chattel mortgage and the supplement thereto. In due course a decree to that effect will be entered.

### Second Memorandum

This cause is now before the Court for a determination of the relative priorities of the claim of the Government and those of the other creditors of Westmoreland Manganese Corporation, principal defendant herein, to the property of said defendant. The controversy between the Government and the other creditors of Westmoreland (hereinafter at times referred to simply as "the creditors") relative to priority has been submitted upon the pleadings and exhibits thereto, certain stipulations of counsel, oral testimony, documentary evidence and written briefs. This memorandum, which deals with said controversy, contains our ultimate findings of fact and conclusions of law with respect thereto; and all requests for findings of fact and conclusions of law are denied, except to the extent that they may be incorporated herein.[1] The Government contends that the liens of its real estate and chattel mortgage and the supplement thereto, both executed on May 22, 1952, are superior to the claims of the other creditors; the latter take the position that for various reasons, presently to be stated, their claims are superior to that of the Government.

The creditors, other than the Government, holding claims of over Three Hundred Seventy Thousand Dollars ($370,000), consist of suppliers of services and materials to Westmoreland in connection with the construction of the washing and concentrating plant and related improvements contemplated by the original contract between Westmoreland and the Government, dated April 7, 1952; there is no dispute as to the correctness of any of the claims, and the amounts thereof are set forth in the several stipulations that have been filed herein. As far as the nature of their claims is concerned, the creditors fall into three groups, namely: those who claim liens under the Arkansas statutes creating "mechanics' and materialmen's liens" and

---

[1]. In a memorandum filed on July 31, 1955 we held that the Government was entitled to judgment against Westmoreland for its principal claim and to foreclosure of its real estate and chattel mortgage and supplement thereto. At that time we did not undertake to pass upon the controversy between the Government and the other creditors, and stated in said memorandum that if it should become necessary to pass upon the issues involved in that controversy, they would be made the subject of a separate memorandum.

"miners' liens";[2] those who do not claim the benefits of the statutes just mentioned, but who hold judgments for various amounts against Westmoreland;[3] and, finally, those who neither claim liens nor have judgments, and who are simply unsecured creditors. Since neither the Government nor Westmoreland disputes the validity or amounts of the claims in question, it goes without saying that both the lien claimants and the unsecured creditors are entitled in this proceeding to judgment against Westmoreland for their respective claims.

In support of their position that the claims of the Government are inferior to their own, all of the creditors contend that the Government's mortgage and the supplement thereto are invalid as to them, except with respect to the land purchased by Westmoreland and the improvements existing thereon at the time of the execution of said mortgages; that the relationship between Westmoreland and the Government was not the conventional mortgagor-mortgagee relationship, and that actually Westmoreland and the Government were joint venturers; that they were "third-party beneficiaries" under the contract between the Government and Westmoreland;[4] and, further, that by reason of certain alleged equitable considerations the Government's claim to priority should be denied.

In addition to the foregoing contentions, which are common to all of the creditors, the lien claimants assert priority under the Arkansas statutes that have been mentioned. The judgment creditors do not claim to have any liens on the lands of Westmoreland or on the

improvements thereon which are superior to those of the Government or of the lien claimants; nor do they assert any claim to priority with respect to personal property of Westmoreland which is covered, or alleged to be covered, by mechanics', materialmen's or miners' liens. They do contend, however, with respect to certain automotive equipment purchased by Westmoreland that there was no compliance with Section 60 of Act 142 of 1949, Ark.Stats. § 75–160, hereinafter discussed, and that for that reason the Government's mortgages, even if otherwise valid, are invalid as to such equipment as far as creditors acquiring a lien by levy of execution are concerned, and that the Court should, in the exercise of its discretion, now permit them to have execution issued out of the State Court and levied upon such equipment, notwithstanding the existing receivership, so as to give them the benefit of the statute last mentioned.

The Government, for its part, denies the validity of all of the contentions of the creditors above outlined, and, as indicated, takes the position that its mortgage liens entitled it to priority as against all of the other creditors.

Taking up first the question of the validity of the Government's mortgages, it is not contended that said mortgages were not properly executed, acknowledged and recorded, and apparently the creditors do not contend that said mortgages are invalid as to them as far as the land itself and the improvements existing thereon at the time the instruments were executed are concerned. They do contend, however, with respect to the improvements subsequently plac-

2. The "Mechanics' and Materialmen's Lien Statute" is Act 146 of 1895, as amended, now codified as Ark.Stats. § 51–601 et seq. The "Miners' Lien Statute" is Act 615 of 1923, now codified as Ark.Stats. § 51–701 et seq.

3. All of the judgments, except one, were rendered by the Circuit Court of Independence County, Arkansas; the exception is a small judgment rendered by the Municipal Court of the City of Batesville, Arkansas, which has been docketed, as

prescribed by law, with the Circuit Clerk of Independence County.

4. We do not understand that the creditors carry their joint venture and third party beneficiary arguments so far as to claim that the Government is directly liable to them for materials and services furnished to Westmoreland; but they do contend that by reason of the alleged relationship between the parties the Government's claim should not be accorded priority over theirs.

ed upon the land, and with respect to the personal property subsequently acquired by Westmoreland, that the descriptions in said mortgages are, as to third persons, void for indefiniteness, and, further, that said descriptions are "ambulatory." We do not agree.

■■ It is a well settled principle of Arkansas law that a mortgage will not be held void for uncertainty, even as to third persons, where by any reasonable construction it can be sustained; and where the description used furnishes a key whereby a person, aided by extrinsic evidence, can ascertain what property is covered, such description is sufficient. Johnson v. Grissard, 51 Ark. 410, 11 S. W. 585, 3 L.R.A. 795; Snyder v. Bridewell, 167 Ark. 8, 267 S.W. 561; and American Investment Co. v. Gleason, 181 Ark. 739, 28 S.W.2d 70. Furthermore, a description in a chattel mortgage is sufficient if a disinterested person, aided by inquiry suggested by the instrument, can identify the property intended to be covered. Gurley v. Davis, 39 Ark. 394; Beckler v. Snerly, 169 Ark. 317, 273 S.W. 9; Blankenship v. Modglin, 177 Ark. 388, 6 S.W.2d 531; Neece v. Guerin, 210 Ark. 954, 198 S.W.2d 161.

In Johnson v. Grissard, supra [51 Ark. 410, 11 S.W. 586], a mortgage was upheld as against a third person where the only description of the property was " 'All my crop of corn, cotton, or other produce that I may raise, or in which I may have in any manner an interest, for the year 1884, in Faulkner county, Arkansas.' " The Court said that the description was not so indefinite and uncertain that it could not be made certain by extrinsic evidence; that the record of the mortgage was constructive notice, and that all persons buying any cotton from the mortgagor in Faulkner County were bound to inquire whether it was covered by the mortgage to Grissard. In Snyder v. Bridewell, supra, a mortgage was held good as to third parties where the description was simply " 'all property owned by the Nashville Lumber Company or afterwards acquired by it in Howard [county] * * * Arkan-

sas.' " The Court stated that the deed furnished a key whereby the land might be identified and was sufficient. In American Investment Co. v. Gleason, supra, the Court stated that " * * * it is settled in this state that a deed or mortgage cannot be declared void for uncertainty if it is possible, by any reasonable rule of construction, to ascertain from the description, aided by extrinsic evidence, what property is intended to be conveyed. In short, the office of the description in a deed or mortgage is not to identify the land, but to furnish the means of identification." 181 Ark. at page 743, 28 S.W.2d at page 72.

In Blankenship v. Modglin, supra [177 Ark. 388, 6 S.W.2d 532], the chattel mortgage in question described the mortgaged property as being, " 'All corn and cotton to be grown by [mortgagor] on the farm belonging to Earl Keich.' " That description was held sufficient against third parties although it appeared that Keich owned several farms; the Court pointed out that any disinterested person by reading over the mortgage and by making inquiry could have discovered that the mortgagor lived on one of Keich's farms and was making a crop of cotton and corn on it; it was said: "This court has laid down the rule that a mortgage of personal property is sufficient as to description, if it be such that a disinterested person, aided only by such inquiry as the instrument itself suggests, is able to identify the property." 177 Ark. at page 390, 6 S.W.2d at page 532. In Neece v. Guerin, supra, the Court cited with approval the decision of the Supreme Court of Oklahoma in Hillery v. Waurika Nat. Bank, 100 Okl. 34, 226 P. 1051, wherein it was said, among other things, " ' * * * "As against third persons the description in the mortgage must point out its subject-matter so that such persons may identify the chattels covered, but it is not essential that the description be so specific that the property may be identified by it alone, if such description suggests inquiries or means of identification which,

if pursued, will disclose the property conveyed. * * *" 11 C.J. 457.'" 210 Ark. at page 958, 198 S.W.2d at page 163.

The description of property in the original mortgage before us consists of six sections, alphabetically designated A–F, both inclusive; in sections A through D the land and mineral rights here involved are definitely and specifically described; Section E consists of two numbered paragraphs, the first of which specifically describes certain personal property owned at the time by Westmoreland, and the second of which covers, "Furniture, fixtures, machinery and equipment and all other personal property hereafter acquired by Mortgagor, together with all and singular the parts of and accessories to all said property whether now belonging thereto or hereafter added thereto by way of renewal, replacement or otherwise." Section F covers, "Any and all property, real, personal or mixed or rights to property hereafter acquired by Mortgagor, including the special bank account or accounts established by Mortgagor pursuant to the agreement of April 7, 1952 between Mortgagee and Mortgagor and any amendment thereto."

The supplemental mortgage recites that it was executed as a supplement to the original mortgage and that no rights under the original mortgage were waived by the mortgagee; Section I of said supplemental mortgage consists of a preamble and several paragraphs, alphabetically designated A–G, both inclusive. In the preamble it is recited that for the purpose of making more explicit the description of certain properties encumbered by the original mortgage the mortgagor acknowledged that said original mortgage was intended to and did cover, and that the supplemental mortgage also covered the property referred to in the succeeding paragraphs of the Section. Paragraph A specifically refers to

the washing and concentrating plant then in existence and owned by Westmoreland, located about seven miles from the town of Cushman in Independence County, Arkansas, and Paragraph B specifically refers to the new washing and concentrating plant proposed to be built by Westmoreland at or near the site of the original plant; said paragraphs not only refer to the plants but also to "all buildings, structures, erections, tanks, towers, conveyors, motors, boilers, engines, pipes, wiring, shafting, furnaces, sidings, switch tracks and all other machinery equipment and personal property (including office equipment and automotive equipment) now or at any time hereafter comprising said plant, or used by Mortgagor in connection with the operation of said plant, or held or acquired by it for possible use in such respect." Paragraph C purports to cover, "All other machinery, equipment and personal property (whether similar or dissimilar to any of the foregoing), wherever located, now owned by Mortgagor or at any time hereafter acquired by it."

As indicated, the original mortgage specifically described the lands owned by Westmoreland on May 22, 1952; [5] and we are satisfied that Paragraphs A and B of Section I of the supplemental mortgage, when read in the light of the principles laid down in the cases heretofore cited, are sufficiently definite in their descriptions of the existing plant and the new plant, and of the "buildings, structures, erections, tanks, towers, conveyors, motors, boilers, engines, pipes, wiring, shafting, furnaces, slime pond facilities, sidings, switch tracks and all other machinery, equipment and personal property" owned or to be acquired for use in connection therewith, to be binding upon third parties such as the creditors here. The creditors were on notice as to the existence of both the original and the supplemental mortgage, and a reading of those instruments by any disinterested person would have revealed

---

5. There is no evidence that Westmoreland has ever acquired any lands other than those described in the original mortgage, so we are not here concerned with any after acquired lands.

that the Government was taking a mortgage on all land that Westmoreland owned in Independence and Izard Counties, Arkansas, on the plant that was then in existence, and on the one that was to be built, including all of the items of property that Westmoreland then owned or might thereafter acquire for use in connection with said plants and in connection with its contemplated mining operations. With this knowledge any reasonable inquiry would have revealed what property of Westmoreland was covered by the mortgages at any particular time; naturally, it was impossible for the parties at the time to describe in detail all of the particular items of property which might be acquired in the future. It should be kept in mind that we are not here concerned with any property of Westmoreland located anywhere except Independence and Izard Counties, Arkansas, nor are we concerned with any property acquired by Westmoreland for uses other than the construction of the plant and the mining and treating of manganese ore.

Counsel for the creditors have not cited us to any case which would indicate that the descriptions contained in Paragraphs A and B of Section I of the supplemental mortgage are void as to third parties for indefiniteness. If the Government were required to rely solely upon Section F of the original mortgage and upon Paragraph C of Section I of the supplemental mortgage in order to bind the new improvements and the personal property subsequently acquired, it might be arguable that the descriptions contained in those paragraphs are too vague and indefinite to be valid as against third parties; see Turrentine v. Thompson, 193 Ark. 253, 99 S. W.2d 585. But, as has been pointed out, such is not the case.

In support of their contention that the mortgages have "ambulatory" descriptions and are void as to them, the creditors cite Hughes, "Arkansas Mortgages," Section 64, wherein it is said: " * * * A description is ambulatory if it fits one article at one time and another article at another time. Thus a mortgage by the owner of an operating mill of 50,000 feet of lumber 'of the last sawing', meaning that the mortgage should always cover the last 50,000 feet sawed is ambulatory and void." In support of that statement the author cites Smith v. McCoy-Kessinger Lumber Co., 108 Ark. 162, 157 S.W. 735; and that case so holds. But we do not have here the situation presented in the Smith case. It is obvious that under a mortgage such as was involved in that case the property covered by the mortgage would vary from day to day in that a lot of lumber that was "of the last sawing" on one day would not be "of the last sawing" on the following day; in the instant case, however, we are not concerned with a mortgage under the terms of which property acquired by Westmoreland would be covered only temporarily; under the provisions of the mortgages here involved all property acquired by Westmoreland would be covered by such mortgages and would remain covered until the mortgages were satisfied. Of course, since the mortgages were construction mortgages, and since Westmoreland was to acquire properties with money to be advanced by the Government, the amount and value of the latter's security would increase as the project progressed, but that would not affect the validity of the mortgages. Any argument to the contrary would simply amount to a contention that after acquired property clauses in mortgages are void, which is not the law.

It is further argued by the creditors on this phase of the case that Section II of the supplemental mortgage[6]

6. That section reads as follows: "While it is agreed that all future acquisitions by Mortgagor of real property, mineral interests and personal property shall, by virtue of the 'after acquired property' provisions of said Real Estate and Chattel Mortgage, and of this Supplemental Mortgage, be subject to the lien of each of said two instruments, nevertheless, to the end that such future acquisitions may

constitutes an admission that the descriptions of future acquisitions contained in the original mortgage and in the supplemental mortgage are void for indefiniteness. But the idea of such an admission is expressly negatived by the language of Section II which has been quoted. All that Section II accomplished was to give the Government the right to demand from time to time that new mortgages be given it specifically describing the items of property that had been acquired by Westmoreland at the times that such demands might be made; that the Government, out of an abundance of caution, desired that right does not imply that the existing descriptions were insufficient, and we have held that they were sufficient.

As to the joint venture theory advanced by the creditors, the contract between the Government and Westmoreland required the latter to produce and sell to the Government over a period of years 264,000 long, dry tons of manganese ore to be paid for at stated prices; in order to enable Westmoreland to acquire mineral lands, to build its plant, and to get into production the Government agreed to advance to Westmoreland not more than $3,807,250, including $155,000 which was to be advanced if, and only if, it should be determined that a "second slime pond" should be constructed. Of this sum of $3,807,250, $418,600 was to be used for land acquisition, $2,788,650 was to be used for the acquisition and completion of the new facilities, and $600,000 was to be used for working capital; all advances were to bear interest at the rate of 4% per annum. It was agreed that so long as any part of the moneys advanced by the Government should remain unpaid, the ownership and management of the corporation should be subject to governmental approval, and it was agreed that no substantial change in ownership or management would be made without the prior approval of the Government. It was agreed that Westmoreland might at any time repay its debt to the Government, either in whole or in part, and that upon expiration of the term of the contract, or upon prior termination thereof, any advances made by the Government that had not been repaid should be immediately due and payable. The contract further provided that Westmoreland might withdraw from net profits after taxes not more than $75,000 in any calendar year. It was further agreed that Westmoreland would make its facilities available for the processing at fair and reasonable charges to be fixed by the Government "any and all quantities of mine-run ore of types and kinds similar to those which are the subject matter of this agreement which are furnished by the Government from ores purchased by the Government from other producers in your area throughout the term of this contract," but not more than 10% of the ore to be processed by Westmoreland to be sold to the Government under the contract. Paragraph 7 of the contract provided that it should terminate upon the production of 264,000 long dry tons of ore from the facilities to be constructed, or upon the expiration of six years after commencement of production, or upon the repayment to the Government of all advances plus interest. Westmoreland was required to maintain proper books and records, and adequate insurance, and to submit certain periodic reports; and the Government was given the right to main-

be encumbered under instruments more specifically describing the same, Mortgagor agrees that it will, from time to time, upon request of Mortgagee, execute, acknowledge and deliver to Mortgagee, and cause to be established of record, such additional instruments, on form approved by Mortgagee, as may be necessary to encumber all such after acquired property items under a more specific description. The failure or refusal in any instance to execute such additional instruments and establish the same of record shall constitute a ground for the acceleration (at Mortgagee's option) of the maturity of the secured indebtedness additional to the events of acceleration recited in said Real Estate and Chattel Mortgage."

tain one or more representatives at the site of the work "to have access to the books and records of the corporation at all reasonable times, to audit such books and records and to observe all operations of the corporation." The final paragraph of the contract recites that it was entered into pursuant to the Defense Production Act of 1950, as amended, Public Law 774, 81st Congress, and Public Laws 69 and 96, 82d Congress, 50 U.S.C.A.Appendix, § 2061 et seq.

In the preceding paragraph we have endeavored to abstract those provisions of the contract upon which the creditors' claim of joint venture is based, and although the creditors urge that said contract constituted a joint venture between the Government and Westmoreland, we do not believe that any such relationship was created thereby or by the performance of the parties under it. In order to constitute a joint venture it is essential that there be a joint proprietary interest in the subject matter of the venture, a right of mutual control with respect thereto, and an agreement, express or implied, for the sharing of profits. 30 Am.Jur. "Joint Adventures", Sections 11 and 12. In State ex rel. Attorney General v. Gus Blass Co., 193 Ark. 1159, 105 S.W.2d 853, the Supreme Court of Arkansas held that there was no joint venture between the Gus Blass Company and one Gainsburg, who was operating an optical department in the former's store under a contract of lease, notwithstanding the fact that rent was paid out of net sales, that salaries of employees were advanced by the Company and charged to the lessee, and that the Company had a right to exercise control over who should be employed by the lessee. The Court, speaking of what was necessary to constitute a joint venture, said:

"To constitute a joint adventure, there must be the elements of a partnership. As between the parties themselves, there must have been an intention to form a partnership as expressed in the contract or gathered from acts of the parties and circumstances which may interpret such agreement. As between themselves or third parties, there are certain requisites necessary before the law will in any event regard the relationship as that of partners. 'The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interests in the profits.' Meehan v. Valentine, 145 U.S. 611, 12 S.Ct. 972, 973, 36 L.Ed. 835. The doctrine announced in this case was quoted with approval in Culley v. Edwards, 44 Ark. 423, 51 Am.Rep. 614. That case was followed in Roach v. Rector, 93 Ark. 521, 123 S.W. 399, 401, in which it was stated in effect that the parties to the contract must be coprincipals in the business, and if it is owned by one and the other receives the profits or a portion thereof, for services or otherwise, the relationship of partners does not exist. Quoting further from that case, it is said: 'As between the parties themselves, before it can be said that the relationship of partners has been created, it is essential that the parties themselves intended by the effect of their contract to form such a partnership business, and that they should have a common ownership and community of interest in the properties of the business, and that they should share in some fixed proportion in the profits thereof only as profits of the business.'

"These rules apply not only to a general partnership, but to a limited one, a joint adventure. The facts * * * in the instant case * * * show that the parties did not intend to form a partnership, that they did not have a common ownership and community of interest in the property of the business, nor did they share in the profits in some fixed ratio. This being true

it follows that the contract was one of lease, * * *." 193 Ark. at pages 1176–1177, 105 S.W.2d at page 861.

 It is clear that under the contract involved here the Government had no proprietary interest in the Westmoreland properties whatever, other than the security interest created by the mortgages, and it is equally clear that in no event was the Government to share in any profits earned by Westmoreland. It is, of course, true that the Government was interested, in the discharge of its duty as a sovereign to provide for the national defense, in procuring manganese for stock pile purposes, and in that sense it would have benefitted from Westmoreland's contemplated performance; but the receipt or expectation of benefits is common to almost all contracts; and it certainly cannot be said that because a contracting party benefits from the performance of the contract by the other they are joint venturers, or that the former is sharing in the profits earned by the latter as a result of his performance. Here, both parties were interested in the performance of the contract, but their interests were entirely different qualitatively; the Government was interested in the production of manganese for defense purposes, whereas Westmoreland was interested in financial profits.

 The creditors lay stress upon the fact that the Government advanced, or agreed to advance the moneys that would be required by Westmoreland in order to perform the contract, and that the Government was not motivated in so doing by a desire to earn interest on the funds to be so advanced; but we deem that to be immaterial. It is not at all unusual for a party to advance money to another to enable the latter to produce or process articles for the purpose of thereafter selling them to the former; in such cases provisions for interest on the advances are ordinarily merely incidental to the main object of the parties. But such an arrangement does not constitute them joint venturers; in

this connection in 30 Am.Jur. "Joint Adventures," Section 23, page 688, it is said: "Although one party's contribution to a joint adventure may be to provide the funds necessary to finance it, the mere fact that one loans or advances money to finance the scheme of another does not make him a joint adventurer with such other in carrying out the scheme. Nor, in general, does such a lender become a joint adventurer by reason of the borrower's agreement to pay him as compensation for advancing the money a share of the profits received, where the lender has no control over or interest in the scheme itself beyond such right to a share of the profits, and does not share in the losses." It is true that in the instant case the Government had a right to exercise, at least in a negative sense, certain control over Westmoreland in its operations; but that right of control was reserved solely for the purpose of protecting its security interests and seeing that the money advanced by it was not used for unauthorized purposes; and it must be remembered that under the express terms of the contract Westmoreland at any time could have freed itself from governmental control simply by repaying the Government the moneys advanced, plus interest.

Counsel for the creditors insist on referring to the Westmoreland project as a "Government project." It was not a "Government project," but was Westmoreland's project financed by the Government to the extent agreed upon, and as authorized by the Acts of Congress referred to in the contract. Had Westmoreland completed the contract, then upon the expiration thereof, it would have owned the remaining ore body and the residual value of the plant, equipment and facilities, the Government having no interest therein.

In support of their claim of joint venture the creditors cite Laser v. State ex rel. McKinley, 198 Ark. 945, 132 S.W.2d 193; Fourth National Bank of Montgomery v. Portsmouth Cotton Refining Oil Co., 5 Cir., 284 F. 718; and Dexter

& Carpenter, Inc., v. Houston, 4 Cir., 20 F.2d 647. None of those cases appears to be in point. In the Laser case no question of joint venture was raised; the Court simply held that under the facts in that case the lease arrangement there involved was "just a method of operating the coal mine by appellant (lessor) himself" for his own financial benefit; in the instant case Westmoreland was in no sense an agent of the Government; it was building a plant for its own use and benefit and was intending to mine and treat manganese ore to be sold to the Government, the profits to inure to the benefit of itself; furthermore, the control which the Government had over the operation was essentially negative, and, as stated, Westmoreland could free itself from that control at any time by discharging its debt. As to Fourth National Bank of Montgomery v. Portsmouth Cotton Oil Refining Co., supra, a reading of the opinion of the District Court, Portsmouth Cotton Oil Refining Co. v. Fourth National Bank, D.C. Ala., 280 F. 879, reveals that there the Court was concerned with a corporation that was, in effect, a subsidiary of the Bank, and that the latter completely controlled and dominated all of its activities, and that it owned no property that had not been conveyed to it by the Bank. Here, Westmoreland was not a subsidiary of the Government; it had its own corporate existence and some assets before the Government ever came into the picture, and it was pursuing its own ends. True, the Government agreed to finance its operations, but, as we have seen, that is not sufficient to create the relationship of joint venturers. Dexter & Carpenter, Inc., v. Houston, supra, is not at all applicable here; there, two wholesalers agreed between themselves to lend money to third persons to purchase and operate a coal mine; as consideration for the loan the two companies were to be given the exclusive agency to sell the output of the mine for a period of years; it was held that in making this loan the two *wholesalers* were, as between themselves, joint venturers; but it was not even suggested that either of them was engaged in a joint venture with the persons who were to buy and operate the mine.

Before leaving the question of joint venture it should be pointed out that we recognize that in certain circumstances there may be a joint venture by estoppel as to third parties, regardless of the relationship of the parties as between themselves. Here, however, there is no evidence that any authorized officials of the Government ever represented to anyone that the Westmoreland project was a joint venture between the Government and Westmoreland or ever took any action that would indicate that such was the case. Hence, there is nothing here upon which a finding of joint venture by estoppel can be predicated.

The creditors, in support of their claim that they were "third party beneficiaries" under the contract between the Government and Westmoreland, point to those provisions of the contract which required Westmoreland to construct its plant and produce manganese, and to make necessary commitments for supplies and services to enable it to do so, to those which obligated it to establish a separate bank account or separate bank accounts, to refrain from commingling funds advanced by the Government with its own funds, and to establish a counter-signature system for the disbursement of funds advanced by the Government; and they lay particular emphasis upon Paragraph 5(c) of the contract which required Westmoreland to furnish the Government with "unencumbered and unqualified mortgages covering the new facilities and all mining property presently owned by you, which will be fully paid for through the advance of funds by the Government as prescribed herein." It is argued that those provisions were inserted for the protection of creditors, and that they were entitled to rely thereon. We reject that argument.

The requirement that Westmoreland should build the plant and should pro-

ceed to make necessary commitments for materials and services was, in our estimation, nothing more than an expression of Westmoreland's primary obligation under the contract; of course, the Government desired for the plant to be constructed and operations commenced as soon as possible, and it desired to avoid unnecessary delays on the part of Westmoreland in making commitments for needed labor and materials. The requirements for separate bank accounts and for a counter-signature system were, it seems obvious, inserted not for the benefit of creditors but for the protection of the Government's financial interests, and to insure that there was no dissipation or misappropriation of funds. The phrase in the contract that has been quoted did not amount, in our opinion, to an undertaking by the Government to see to it that everyone who supplied materials or services to Westmoreland would be paid out of the funds advanced by the Government; rather, it seems nothing more than a recognition that Westmoreland was to pay for such materials and services, and that it was to use the money advanced by the Government for that purpose. There is no undertaking that the funds to be advanced by the Government would be sufficient to pay all of Westmoreland's bills; in this connection it should be noted that the Government had no control over the commitments that Westmoreland might make, or with respect to the ultimate cost of the facilities; the Government did limit itself to an overall advance of $3,807,250, broken down into at least the three major categories of land acquisition, acquisition and construction of new facilities, and working capital; and it did have control over the *disbursement* of funds advanced. Had the Government undertaken to protect the creditors or to underwrite all of Westmoreland's obligations, it is inconceivable to us that it would not have reserved some control over the liabilities that Westmoreland might incur, or have inserted some provision in the contract which would have protected it from un-controlled expenditures by the contractor; but such was not done. To our mind, the third party beneficiary argument overlooks, as do some of the other arguments, that this was Westmoreland's project, and that it was the duty of the latter, rather than of the Government, to build the plant and pay for it; the only duties of the Government were to make advances under the terms of the contract, and to purchase manganese from Westmoreland and to pay the stipulated prices therefor.

Nor do we agree with the creditors that there are equities here that should move the Court to deny to the Government any priority to which it is otherwise entitled. The position of the creditors in this connection seems to be that they relied upon the Government to protect their interests and to see that they were paid; that the Government by reason of its control over the disbursement of funds could have protected them and that it failed to do so; that the Government did not advance to Westmoreland all of the money that it was supposed to advance, and for that reason should be denied priority; and that the Government, after the execution of Amendment No. 1 to the original contract, withdrew the balance in Westmoreland's special bank account amounting to $119,230.31, and that it should, in equity, be required, in any event, to make that sum available to be applied on the claims of the creditors.

 The fallacy of those contentions lies in the fact that the Government contracted with Westmoreland and not with the creditors; there was no privity between the latter and the Government, the Government owed them no duty to protect their interests, and there is no evidence here that any Government official ever took any action that would have entitled any of the creditors to rely upon the Government for the satisfaction of its claim.

Apart from Crow-Burlingame Company and Bragg's Electric Construction Company, there is no evidence that any of the creditors in fact relied upon the

Government in extending credit to Westmoreland; but assuming for purposes of argument that in extending such credit they did rely generally upon the Government, in the sense that they thought that the latter would see to it that they were paid, they had no right under the contract so to do. If they are to prevail under the theory now under discussion, they must show that some responsible official of the Government took some action calculated to lead them to believe that the Government would protect their interests, and that they relied upon such action when they extended credit to Westmoreland. This, they have failed to do.

There is no evidence here that any authorized agent of the Government ever at any time made any statements or took any action that would indicate to the creditors that the Government was underwriting Westmoreland's obligations, or that in controlling Westmoreland's disbursements, or otherwise, it was purporting to protect the interests of the creditors, or doing anything except protecting its own interests. As we have said, the Government had no control over Westmoreland's commitments or over the ultimate cost of the project; and, furthermore, it had nothing to do with initiating payments to any creditor. That initiative lay entirely with Westmoreland; when its officials would submit an invoice and check to the Dallas Office of the General Services Administration, Mr. R. B. Chapman, who was the Regional Disbursing Officer at that office, would check to see whether or not there were funds available to pay such invoice, and if there were, and if the invoice and check were in proper order, he would countersign the check and mail it to the payee thereof; otherwise, it would be returned to Westmoreland. We do not think that the mere fact that from time to time the creditors received checks which had been countersigned by Mr. Chapman, gave them any right to assume that the Government was guaranteeing the payment of their accounts, or that the counter-signature system had been devised for their benefit or protection.

 Moreover, aside from what the creditors may have thought about the matter, the fact remains that Mr. Chapman was not a contracting officer and had no authority to bind the Government to pay any claim, or to guarantee the payment of any claim. He was simply a disbursing officer whose functions were essentially ministerial. It is a well settled principle of law that all agents of the Government are special agents with limited authority; and all parties dealing with them are charged with notice of that fact and of the limitations upon the authority of the agents with whom they deal.[7] As pointed out in our first memorandum, the responsible Government officials who were charged with the administration of this contract were Mr. John G. Ford, Director of the Contracts Negotiation Division of the Defense Materials Procurement Administration, and his deputy, Mr. Arthur L. Sherman, and that fact could have been easily ascertained by inquiry on the part of any of the creditors. There is no evidence that any of the creditors ever inquired of either Mr. Ford or of Mr. Sherman, or of any of their superiors in the D.M.P.A., whether or not the Government was standing behind Westmoreland's obligations; such inquiry could have readily been made, and had it been made, the inquiring creditors, we are satisfied, would have been promptly informed that the Government was not guaranteeing the payment of any claims.

Now, the evidence does show that certain conversations were had on different occasions between Mr. Chapman and representatives of Crow-Burlingame and

---

**7.** Without intimating that the distinction is of importance here, we point out in passing that we are satisfied that in its dealings with Westmoreland the Government was acting in its sovereign or governmental capacity, rather than in a "proprietary" capacity. In acquiring manganese for stockpiling purposes the Government was acting entirely in the interest of national defense.

Bragg's Electric Construction Company, respectively; we have carefully considered the testimony bearing upon those conversations, and we do not think that it can be fairly said that in the course thereof Mr. Chapman undertook on behalf of the Government to guarantee the payment of the respective claims of the two creditors just mentioned, or to assure their representatives that their claims would be paid in any event out of Government funds; nor do we feel that the representatives of those two creditors could have reasonably so understood. But even were the case otherwise, the fact remains that Mr. Chapman was simply a disbursing officer, and all parties dealing with him were charged with notice of the limitations on his authority.

With particular reference to the second conversation between Mr. Chapman and the representatives of Bragg's, it appears that Mr. Chapman said, in effect, that if approved invoices for the balance of Bragg's contract should be presented, checks in payment therefor would be countersigned; and had those invoices been in fact presented, payment might well have been made. As stated, however, Mr. Chapman could not initiate any payments to Bragg's or to any other creditor, and it does not appear that Westmoreland ever presented for countersignature any check or checks in payment of the balance due Bragg's.

As to the action of the Government in declining to advance moneys to the full extent of its original contractual obligations, it should be repeated that the Government's obligations ran exclusively to Westmoreland and not to the creditors. Therefore, even if the Government failed to advance all of the moneys that it should have advanced, the creditors would be in no position to complain thereof. It should be said, however, that the creditors' assertion that the Government did not advance all of the moneys that it was required to advance is not strictly accurate from a factual standpoint. Under the contract advances were to be made to Westmoreland only upon the latter's request, and there is no question that the Government advanced to Westmoreland all of the moneys which the latter requested to be advanced under that contract, the last request being made about January 12 and being honored by a deposit to Westmoreland's credit in Special Account No. 1 around February 14; and the evidence further shows that even after the Government took the position that it was not required to countersign checks drawn on flow sheet categories that were overrun, it continued, up until the execution of Amendment No. 1, to honor checks drawn on categories that were not overrun. It should be remembered that the Government was never obligated to advance for construction purposes, or for the purchase of material and equipment, funds earmarked for working capital; and by March 6, 1953 it had been admitted by Westmoreland that there was an overrun of more than $500,000 in the major category of funds earmarked for construction and acquisition of new facilities, and Westmoreland had requested the Government to advance additional funds over and above its original commitment to take care of that overrun. Whether the Government was justified in refusing after the latter part of February, 1953 to honor checks drawn on overrun minor categories or not, a question which we did not decide in connection with the dispute between the Government and Westmoreland, and which we do not decide now, certainly it was contending that it was not required to honor such checks, and it was clearly not obligated to advance Westmoreland additional money over and above the amount originally contracted for. Under such circumstances, we do not think that the Government in refusing to countersign checks drawn on overrun categories acted so unreasonably or oppressively with respect to the creditors, to whom it owed no contractual duty whatever, as to deprive it of its right to priority here, if such right otherwise exists. As far as purely moral obligations are concerned, it seems to us that the

obligation that the Government officials owed to the people of the United States in general to protect the public purse was equal to or greater than any supposed moral obligation that it may have owed to the creditors.

As to the withdrawal of the balance in Special Account No. 1, which was effected pursuant to Amendment No. 1 to the original contract, that also was a matter purely between Westmoreland and the Government. Moreover, although it may be conceded that the reason for the withdrawal of that balance was to prevent it from being seized by any one or more of the creditors, it should be kept in mind that the Government had a lien on that account whereas the creditors did not.

■ While the matter was not argued in the briefs, we feel that some reference should be made to a press release which the Government issued contemporaneously with the execution of Amendment No. 1, copies of which release were circulated among the creditors. That release, in our eyes, would tend to create the impression that Westmoreland's application for additional funds was to be given early and favorable consideration, and that the Government had no thought of terminating the contract. Had the evidence showed that any of the creditors had extended credit to Westmoreland on the strength of the press release, or in reliance thereon had failed to take any steps available to them that would have protected their interests or improved their positions, an equitable argument could be made on behalf of such creditors. Such, however, is not the case. It is clear that no creditor extended credit to Westmoreland after the execution of Amendment No. 1, and there is no showing that any creditor refrained, on the strength of the press release, from taking any steps that it would have taken but for such release. Therefore, we consider that the release has no significance here.

■ Having disposed of the contentions common to all of the creditors, we now turn to a consideration of what we consider to be really the crucial issue involved in the dispute which is the subject of this memorandum, namely, whether or not under the Arkansas lien statutes that have been mentioned the lien claimants are entitled to priority over the Government, a question that we consider to be entirely one of Arkansas law. Prefatory to a discussion of that issue it may be said that counsel have not cited us to any case, nor have we found a case that we consider to be dispositive of said issue, although a number of Arkansas cases have been cited and discussed which are applicable here, as far as they go. In taking up the question of priority as between the Government and the lien claimants under the Arkansas statutes it will be desirable at the outset to quote the pertinent provisions of those statutes, and to state certain general principles announced by the Supreme Court of Arkansas in regard thereto.

The relevant parts of the Arkansas mechanics' and materialmen's lien statute, which has been cited, and which for simplification we shall refer to as the "Mechanic's Lien Statute," [8] are as follows:

*Ark.Stats., Section 51–601:* "Every mechanic, builder, artisan, workman, laborer or other person who shall do or perform any work upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection, improvement upon land, * * * under or by virtue of any contract with the owner or proprietor thereof, * * * upon complying with the provisions of

---

**8.** Actually, none of the creditors here is a "mechanic" in the strict sense of the term, or a "laborer". Most of the lien claimants are materialmen, although Latrobe Construction Company supplied only labor for the Westmoreland project, and

Bragg's Electric Construction Company supplied both labor and material. All laborers, however, appear to have been paid in full, either by Westmoreland or by Latrobe or Bragg's, as the case happened to be.

this act, shall have for his work or labor done, or materials, fixtures, engine, boiler or machinery furnished a lien upon such building, erection or improvement, and upon the land belonging to such owner or proprietor on which the same are situated, to the extent of one acre * * *."

*Ibid., Section 51–604:* "The entire land, to the extent aforesaid, upon which any building, erection or other improvement is situated, including as well that part of said land which is not covered with such building, erection or other improvement as that part thereof which is covered with the same, shall be subject to all liens created by this act to the extent and only to the extent of all the right, title and interest owned therein by the owner or proprietor of such building, erection or other improvement for whose immediate use or benefit the labor was done or things were furnished."

*Ibid., Section 51–605:* "The lien for the things aforesaid, or work, shall attach to the buildings, erections or other improvements, for which they were furnished or work was done, in preference to any prior lien or incumbrance or mortgage existing upon said land before said buildings, erections, improvements or machinery were erected or put thereon, and any person enforcing such lien may have such building, erection or improvement sold under execution, and the purchaser may remove the same within a reasonable time thereafter; Provided, however, That in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act."

*Ibid., Section 51–607:* "The lien for work and materials as aforesaid shall be preferred to all other incumbrances which may be attached to or upon such building, * * * or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvements."

*Ibid., Section 51–611:* "The liens for work and labor done or things furnished as specified in this act, shall be upon an equal footing, without reference to the date of filing the account or lien; and in all cases where * * * sale shall be ordered and the property sold, which may be described in any account or lien, the proceeds arising from such sale when not sufficient to discharge in full all the liens against the same without reference to the date of filing the account or lien, shall be paid pro rata on the respective liens; * * *."

The relevant portions of the "Miners' Lien Statute" are as follows:

*Ark.Stats., Section 51–701:* "Any person, corporation, firm, association, partnership, materialmen, artisan, laborer or mechanic, who shall under contract, express or implied, heretofore or hereafter made, with the owner or lessee of any land, mine or quarry, * * * perform labor or furnish fuel material, machinery or supplies, used in the digging, drilling, torpedoing, operating, completing, equipping, maintaining or repairing any such * * mine or quarry, * * * shall have a lien on the whole of such land or leasehold interest therein, or oil pipe line, or gas pipe * * * line, * * * the buildings and appurtenances, and upon the materials and supplies so furnished, and upon said * * * oil or gas pipe line, mine or quarry for which same are furnished, and upon all of the other * * * buildings and appurtenances, including pipe line, leasehold interest and land used in operating for * * * minerals, upon such leasehold or land or pipe line * *,

for which said material and supplies were furnished or labor performed, whether the same are movable or not. * * * " [9]

*Ibid., Section 51–704:* "The lien hereby given against the land * * and the oil pipe line or gas pipe line, * * * situated thereon, upon the materials and supplies so furnished and upon said * * * mine or quarry for which such materials were furnished, or labor performed * * * shall be prior and paramount to and in preference of any and all subsequent liens, encumbrances and mortgages and except as hereinafter provided all liens established hereunder shall be of equal dignity. The lien herein provided for shall attach to the machinery, material, supplies and the specific improvements made, in preference to any prior lien or encumbrance or mortgage upon the land or leasehold interest upon which the said machinery, material, supplies or specific improvements are placed or located, provided, however, that any lien, encumbrance, or mortgage upon the land * * * at the time of the inception of the lien herein provided for, shall not be affected thereby; and the holders of such liens upon such land or leasehold interest shall not be necessary parties in suits to foreclose the lien hereby created."

*Ibid., Section 51–706:* "The provisions of this act shall not be construed to deprive or abridge materialmen, artisans, laborers, or mechanics of any rights and remedies, now given them by law, and the provisions of this act shall be cumulative of the present lien laws of this

State except as herein repealed or modified."

*Ibid., Section 51–708:* "Except as herein expressly provided, the lien hereby created shall be construed, established, preserved and enforced in like manner and in the same time as liens of mechanics are now construed, established, preserved and enforced, provided that where the labor performed, or material, supplies or machinery furnished was under an open, running account, the same shall be construed as a continuous contract and the time within which the verified statement of the claim for lien shall be filed with the clerk of the circuit court shall be computed from the time upon which the last labor was in good faith performed, or the last material, machinery or supplies were in good faith furnished and the lien hereby provided for shall, when perfected, in the manner herein set out, be held in law and equity as security for the entire open, running account whether the same has been partially closed by note or not. * * * " [10]

▮▮▮ From a reading of the first section of the Mechanics' Lien Statute, Ark.Stats. § 51–601, it is clear that one who supplies labor, material, machinery or equipment for any building, erection or improvement upon land has a lien, as against the landowner (in this case Westmoreland), upon such building, erection or improvement and upon the land itself to the extent of one acre; it is equally clear from the fifth section of the statute, however, Ark.Stats. § 51–605, that as against a prior mortgagee, such as the Government in this case, the mechanics' lien created by the statute extends only to the improvement itself,

---

9. While we are not here concerned with any oil or gas well or with any pipe line, the provisions of Section 51–701 and of other sections of the statute relative to pipe lines are included herein in view of our following discussion of Bennett v. Weis, 205 Ark. 198, 168 S.W.2d 379;

and Superior Oil Co. v. Etheridge, 219 Ark. 289, 242 S.W.2d 718.

10. It should be said at this point that no question has been raised with regard to the perfecting in the manner prescribed by the respective statutes of any of the liens involved in this case.

the mortgage on the underlying land retaining its superiority; moreover, where material or labor is furnished for an improvement, before the mechanics' lien is held to be superior to a prior mortgage, it must appear that the new improvement is separate and distinct from existing improvements, or can ' be removed therefrom without injury thereto. The principles just stated have been recognized by the Supreme Court of Arkansas in at least the following cases: Gunter v. Ludlam, 155 Ark. 201, 244 S. W. 348; Imboden v. Citizens Bank, 163 Ark. 615, 260 S.W. 734; Fine v. Dyke Bros., 175 Ark. 672, 675, 300 S.W. 375, 58 A.L.R. 907; Morrilton Lumber Co. v. Groom, 176 Ark. 520, 3 S.W.2d 293; and Barton Lumber & Brick Co. v. Caraway, 178 Ark. 1034, 13 S.W.2d 586. Furthermore, the priority section of the statute itself recognizes by its provision for a separate sale of the improvement under execution that the priority of an existing mortgage on the underlying land is not to be disturbed; and that method of enforcing a mechanic's lien upon an improvement, as against a prior mortgagee, was held to be exclusive in Morrilton Lumber Co. v. Groom, supra. It should be noted, however, that such a lien may be held superior to a prior mortgage even as to the underlying land where a contractual vendor or a mortgagee requires a vendee or mortgagee to make improvements to the property, which would enhance the value of the security, while not advancing or· agreeing to advance any funds for the making of such improvements. Wildwood Amusement Co. v. Stout Lumber Co., 178 Ark. 977, 12 S.W.2d 911; Peoples B. & L. Ass'n v. Leslie Lumber Co., 183 Ark. 800, 38 S.W.2d 759.

■■ While ordinarily a mechanic's lien takes priority over a prior mortgage to the extent of the new improvement constructed on the land, an exception exists under Section 5 of the statute in cases where the "prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erec-

tions, improvements or buildings"; in such case the mortgage is entitled to priority both with respect to the land itself and with respect to the improvements erected thereon. Ark.Stats. § 51-605; Shaw v. Rackensack Apartment Corporation, 174 Ark. 492, 295 S.W. 966; Sebastian County Bldg. & Loan Ass'n v. Minten, 181 Ark. 700, 27 S.W.2d 1011; and Ashdown Hardware Co. v. Hughes, Ark., 267 S.W.2d 294. The cases just cited likewise hold that in applying Section 51-605 it is the purpose for which the loan is made, rather than the use to which the money is actually put, that is controlling. Where a construction mortgage secures future advances, it is superior to intervening mechanics' liens where the making of such future advances is obligatory, but not where such advances are optional with the mortgagee. Ashdown Hardware Co. v. Hughes, supra.

■ In order for a materialman to establish a lien under the statute now being discussed, he must show that the materials furnished by him were actually used in the work; a mere delivery of materials to the site for the purpose of incorporation into the improvement is not sufficient to give him a lien under this statute, although such delivery constitutes prima facie evidence that the material was in fact used in making the improvement. Meek v. Parker, 63 Ark. 367, 38 S.W. 900; Central Lumber Co. v. Braddock Land & Granite Co., 84 Ark. 560, 105 S.W. 583; Van Houten Lumber Co. v. Planters' National Bank, 159 Ark. 535, 540, 252 S.W. 614; Standard Lumber Co. of Pine Bluff v. Wilson, 173 Ark. 1024, 1031, 296 S.W. 27; and Sebastian Building & Loan Ass'n v. Minten, supra, 181 Ark. at page 712, 27 S.W.2d 1011. That principle is applicable here, to the extent that the lien claimants rely upon the Mechanics' Lien Statute, because it is stipulated that some of the material furnished by certain of the lien claimants was never incorporated into the improvements, and is now in storage at the plant site.

Turning now to the Miners' Lien Statute, it should first be noted that the remedy thereby provided for those who supply labor or materials for a mine is cumulative to that given by the Mechanics' Lien Statute, and that such remedy is to be construed, established, preserved and enforced as is that provided by the statute last mentioned. An examination of the Miners' Lien Statute, however, reveals that it is broader than the Mechanics' Lien Statute in three respects which are important here: First, whereas the rights in land of one who claims a lien under the Mechanics' Lien Statute are limited to a maximum extent of one acre, there is no such limitation found in the Miners' Lien Statute, and one who is entitled to the benefit of that statute has a lien on the whole of the land constituting the mine. Second, as has been pointed out, the Mechanics' Lien Statute has a proviso to the effect that where a prior mortgage is given to secure advances of funds made to enable the property to be improved, the mortgage has priority over subsequent mechanics' liens; no such provision appears, however, in the Miners' Lien Statute, and we do not think that it can be read into it by interpretation. Finally, before a person is entitled to a lien under the Mechanics' Lien Statute for materials furnished, he must show that his materials went into the improvement; under the Miners' Lien Statute, however, one who supplies material, machinery or equipment for a mine that never becomes appurtenant to the realty is entitled to a lien on such items as he himself furnishes, but not to a lien on personal property furnished by others which never became attached to the land. Bennett v. Weis, supra, 205 Ark. at page 202, 168 S.W.2d 379.

With regard to priority under the Miners' Lien Statute, persons who supply labor or materials for a mine have a lien which is prior to all subsequent encumbrances, but which is inferior to existing mortgages upon the land and upon items of property and equipment described in such mortgages.

In Estep v. Blue Ribbon Coal Co., 177 Ark. 83, 9 S.W.2d 331, the facts were that laborers worked in and about a coal mine which was being operated under a lease; the lease and certain machinery and equipment on the mine site were mortgaged to the First National Bank of Paris, the mortgage having been given prior to the time that the laborers performed any work. The Court held that the lien of the mortgage was superior to those of the laborers. After quoting the priority provisions of the statute, the Court went on to say:

"The statutory lien given to the miners for work done in operating the mine could not become paramount to a prior recorded mortgage unless the statute creating the lien manifests an intention to give it preference. * * *

"It is true it is expressly provided that the lien given the laborers shall attach to the machinery, material, etc., in preference to any prior lien, incumbrance, or mortgage upon the land or leasehold interest upon which the said machinery, material, supplies, and specific improvements are placed or located, provided that any lien, incumbrance or mortgage upon the land or leasehold interest at the time of the inception of the lien herein provided for shall not be affected hereby. The inception of the statutory lien could not have been before the material and supplies were begun to be furnished and the labor done, and it was not the intention of the statute to make the lien of the laborer or materialman superior to the lien of the prior mortgage upon the leasehold interest and equipment of the mine before the inception of the lien given the laborer by the statute, which expressly declares that such mortgage lien shall not be affected thereby. It was obviously not intended that the laborer or material furnisher should have a superior lien upon the leasehold and equipment of the mine to the lien of

the mortgage existing at the inception of the statutory lien. In other words, at best the statute, under a fair construction, cannot be held to intend the giving of a lien to laborers and material furnishers on the materials, improvements, and equipment of the mine already installed and covered by a valid mortgage of the leasehold at the inception of the statutory lien, which could attach only to such machinery, material, and specific improvements thereafter installed becoming superior to the mortgage lien therefor." 177 Ark. at pages 85–87, 9 S.W.2d at page 332.

And in Roberts v. Tice, 198 Ark. 397, 405, 129 S.W.2d 258, 262, 122 A.L.R. 1177, the Court, speaking of what is now Ark.Stats., Section 51–704, said:

" * * * In other words, a prior lien, encumbrance or mortgage on the land or leasehold only shall not come ahead of laborers and material men's rights to liens on the machinery, materials, supplies and specific improvements not specifically covered by the prior lien, encumbrance or mortgage, and justly so. If laborers and material men perform labor and furnish material to improve a leasehold already covered by a mortgage or other encumbrance, their right to a lien on the improvements is paramount, but not so to the leasehold."

Returning for a moment to the extent of the lien conferred by the Miners' Lien Statute, we desire to discuss briefly the cases of Bennett v. Weis and Superior Oil Co. v. Etheridge, both supra:

In Bennett v. Weis one Thompson owned an oil and gas lease in Lee County, Arkansas, and contracted with one Howard to drill an oil well thereon; Thompson agreed to pay Howard a certain sum for drilling the well, and also supplied three hundred feet of "surface pipe"; Howard borrowed a drilling rig from Bennett under a profit-sharing arrangement, and he also borrowed a steel derrick owned by the United States Oil Company. Weis, the plaintiff, was a dealer in oil, gasoline and other merchandise, and he furnished supplies and materials for use in connection with the drilling operation; his account being unpaid, he filed suit seeking to impress a miner's lien upon the lease, the drilling rig, the pipe, and the derrick, and he prevailed in the Chancery Court. On appeal the decree of the Chancellor was affirmed in part and reversed in part. The Supreme Court held that Weis was entitled to a lien on the lease and on the pipe, but not with respect to the drilling rig or the derrick because the latter were not appurtenant to the land.

In determining the extent of a miner's lien the Court said: "Our statute, by its terms, gives materialmen and laborers a lien (a) on the land or lease; (b) on oil pipe lines; (c) on buildings and appurtenances; (d) on materials and supplies *furnished by the seller;* (e) on all other wells, buildings, appurtenances, etc." 205 Ark. at page 202, 168 S.W.2d at page 381. (Emphasis added.) The Court further said: "It is difficult to draw a distinction between the machinery and the derrick, although some of the judges think such a distinction existed insofar as the record is concerned because of failure to show that the derrick was only temporarily attached to the soil. All agree that the statute gives a lien on the pipe. Some of the judges think * * * that machinery, derrick, and pipe were appurtenances." Ibid., 205 Ark. at page 203, 168 S.W.2d at page 382.

In Superior Oil Co. v. Etheridge, Superior Oil Co. entered into a contract with one McSpadden to drill an oil well on a lease owned by it, and Etheridge furnished the labor and materials necessary to build a wooden access road to the drill site; it was held that Etheridge had a lien on the lease and on several thousand feet of oil well casing which Superior had purchased " 'in the regular course of business' " and had " 'transported to and stored upon the property * * * for its own use.' " 219 Ark. at pages 292–293, 242 S.W.2d

at page 720. In holding that Etheridge had a lien on the pipe the Court said: "The case at bar has aspects like that of Bennett v. Weis, 205 Ark. 198, 168 S.W. 2d 379, 382. In that case Thompson owned oil and gas leases and made a contract with Howard to drill a well and furnish Howard 300 feet of surface pipe. Bennett let Howard have a drilling rig; and the question was as to the extent of the lien of the material supplier, Weis. We held that Weis had no lien on Bennett's rig; but we sustained the lien of Weis, the supplier, 'as to the surface pipe and lease'. In short, we held that the lease and pipe of Thompson, and leaseholder, were subject to the lien of the supplier. Under the authority of that case the pipe on the drill site and also the lease of Superior * * * were properly subjected to the lien of Etheridge." 219 Ark. at pages 296–297, 242 S.W.2d at page 722.

It is clear from a reading of the Bennett case that the Court there held that under the Miners' Lien Statute a supplier of materials has no lien on items of machinery which do not become appurtenant to the land, unless he supplies them himself. It should be noted, however, that the Court allowed Weis a lien on the pipe, some of the judges being of the opinion that it was an appurtenance, and the other judges apparently being of the opinion that it constituted a "pipe line" within the meaning of the statute. In the Etheridge case it is clear that the casing there involved was not appurtenant to the land since it was simply stored at the drill site, but, nevertheless, Etheridge's lien was held to apply to it, although he had not furnished it. This was done expressly on the authority of Bennett v. Weis; had the Court been of the opinion that Etheridge was entitled to a lien on all personal property on the lease, regardless of who supplied it, the effect of the decision would have been to overrule the general holding in the Bennett case, which has been mentioned; the court obviously, however, did not intend to overrule or impair Bennett v. Weis. It

seems clear, therefore, that a majority of the judges in the Bennett case, and all of the concurring judges in the Etheridge case felt that an oil well supplier is entitled to a lien on all pipe on the lease, whether appurtenant to the land or not, not on the basis that such a supplier is entitled to a lien on personal property on the lease in general, regardless of who supplies it, but on the theory that all pipe on an oil or gas lease is a pipe line within the meaning of the statute. On that basis what may appear to be a conflict between the two cases is readily resolved. We conclude, therefore, that the basic holding in Bennett v. Weis has not been impaired.

With the foregoing principles in mind, we now approach the task of applying those principles to the several kinds of property involved in this case so as to determine the relative priorities of the Government and of the creditors under each of the two lien statutes, each type of property being considered separately. Before doing so, however, we deem it well to point out that we are satisfied, although the creditors argue to the contrary, that under the terms of the contract between Westmoreland and the Government, the latter was required to make future advances of funds to the former in order to enable it to perform its contractual obligations, at least so long as Westmoreland performed its part of the bargain. Hence, the future advances contemplated in the contract and mortgages were obligatory in nature, and when made, would relate back to the date of the mortgages.

The several types of property with which we are concerned are: (a) the lands purchased by Westmoreland, together with the improvements existing thereon at the time of the execution of the Government's mortgages; (b) the new improvements placed on said lands by Westmoreland pursuant to its contract with the Government; (c) personal property acquired by Westmoreland in connection with its proposed construction and with its proposed operations and now located on its lands and in the

custody of the Receiver herein. The personal property just referred to may be conveniently subdivided into three categories, namely; personal property consisting of supplies and materials furnished by a number of the lien claimants here for incorporation into the proposed new plant, but which were never in fact incorporated thereinto; personal property acquired by Westmoreland from others than the lien claimants, exclusive of the automotive equipment to which the judgment creditors lay claim; and, finally, the automotive equipment just referred to, none of which, incidentally, was supplied by any of the lien claimants or any of the judgment creditors, and all of which, with the apparent exception of the Willys jeep referred to in the original mortgage, was paid for with funds advanced by the Government under the provisions of the contract.

■ Taking up first the question of the lands themselves and improvements existing thereon as of the date of the mortgages, and assuming for the moment without discussion that the Miners' Lien Statute is applicable in this case,[11] it is clear to us that as far as said lands and existing improvements are concerned the Government is entitled to priority over the lien claimants to the full extent of its claim. As stated, the Government's mortgages were executed on May 22, 1952, and at the same time the Government advanced to Westmoreland the sum of $418,600 to pay for such lands and improvements; at that time none of the lien claimants had supplied any services or materials to Westmoreland. Thereafter the Government made further advances to Westmoreland totalling more than $2,000,000, which sums it was required to advance under the contract, and the repayment of which was secured by its mortgages. As we have seen, neither the Mechanics' Lien Statute nor the Miners' Lien Statute accords priority to the lien created thereby over a prior mortgage as far as the

land and existing improvements are concerned. As a matter of fact, the lien claimants concede that the Government is entitled to priority as to the land and existing improvements to the extent of the $418,600 which the Government advanced to pay for the same, and we do not believe that they seriously contend that the Government is not entitled to priority as to this category of property to the full extent of its claim.

The only possible basis upon which the lien claimants could assert any priority with respect to the land and the improvements thereon at the time of the mortgages is the holdings of the Supreme Court of Arkansas in Wildwood Amusement Co. v. Stout Lumber Co. and Peoples B. & L. Ass'n v. Leslie Lumber Co., both supra; but we are satisfied that both of those cases are readily distinguishable from the instant one.

In the Wildwood Amusement Co. case the owner of a lease sold the same under a conditional sales contract, retaining title in itself until the purchase money notes were paid; as part of the contract the vendee was required to make certain improvements on the property at his own expense; the improvements were made but not paid for, and it was held that the mechanics' lien was superior to that of the vendor, apparently both as to the lease itself and as to the improvments thereon. The Court said:

"* * * [A]s we have already stated, the contract of sale required the purchasers to make the improvements which were made, and at their own expense. The title to the whole property was retained in appellant, including all improvements to be erected on the lease * * *, the effect of which was to constitute [lessee] the agents of the Wildwood Amusement Company for this purpose, as it required them to make these improvements to their property, and which was to remain their property until all the purchase-mon-

11. As will be hereinafter pointed out, the Government takes the position that the Miners' Lien Statute does not apply to this case at all.

ey notes had been paid in full. Under these conditions, we think it would have been no different had the Wildwood Amusement Company itself erected these improvements before the sale and required the purchasers to pay therefor in the contract of sale. * * * " 178 Ark. at page 979, 12 S.W.2d at page 912.

In the Leslie Lumber Co. case a contractual vendor sold certain property and required the vendee to make improvements thereon; the vendor did not originally advance any money for the purpose of making improvements or agree to do so. After the improvements had been commenced, and after mechanics' liens had attached, the vendor did agree to advance certain funds to the vendee for improvement purposes and took a mortgage to secure the advance. It was held that the mechanics' lien was superior to the vendor's lien on both lands and improvements; the mortgage was not discussed since it was obviously inferior to the mechanics' liens which had attached prior to its execution. The basis of the decision was estoppel.

In the instant case we do not have a situation where a landowner enters into a contract of sale, retaining title to the property, and as a condition thereof requires the vendee at his own expense to make improvements, which would enhance the value of the security, without advancing or undertaking to advance any money himself for that purpose; nor do

we have a situation where one agrees to advance funds for improvements, taking a mortgage as security therefor, after such improvements have already been commenced and after the liens of laborers and materialmen have already attached. The Government here never owned the land which Westmoreland purchased, but, on the other hand, advanced moneys to enable Westmoreland to buy the land from third persons, and obligated itself to advance additional moneys for the improvement of the property at a time when none of the lien claimants had furnished any services or materials. As indicated, the Leslie Lumber Company case was decided on grounds of estoppel; the Wildwood Amusement Company decision was based upon agency, but it also might well have been grounded on estoppel. Here, we have no elements of either agency or estoppel.

In taking up the question of priorities as to the improvements placed upon the lands by Westmoreland under its contract with the Government, we deem it well to consider first the argument, advanced by the Government in its final brief, to the effect that the lien claimants here are not entitled to protection under the Miners' Lien Statute because the services and materials furnished by them were not furnished to a "mine" but rather to a "beneficiation plant," which, the Government contends, is not a "mine" within the meaning of the statute.[12] While this argument of

12. The material portions of the Government's argument on this point are as follows: " * * * The statute was obviously written for the protection of laborers and suppliers concerned with the drilling oil and gas lines. It was only incidentally intended to have broader application. Under Section 51–701, a lien is given to any person who furnished labor or material *used in digging, drilling, torpedoing, operating, completing, equipping, maintaining, or repairing* a *mine*. The washing and concentrating plant constructed by Westmoreland * * has nothing to do with the *mining* of manganese. It is a beneficiation plant. The 'mining' is done with the use of draglines, shovels, and heavy hauling equipment. * * * None of the labor or

machinery and supplies used in the construction of the washing and concentrating plant were 'used in digging, drilling, torpedoing, operating, completing, equipping, maintaining, or repairing' of a 'mine.' The washing and concentrating plant could as well have been located in Little Rock, Arkansas, as at Cushman. If it had been so located, we doubt if any of the parties * * * would have argued that the lien created by Section 51–701 attached thereto. The 'mine' in a manganese operation consists of the ore-bearing lands. The statute does not say 'mining operation'; it does not apply to the different states in *refining* or processing ore *already mined* * * *. Assuming that the materials, labor and supplies used in the construction of the

the Government has the virtue of simplicity, we have been cited to no authority which sustains it, and we have found no such authority. While it may be conceded that strictly speaking, a "manganese mine" consists only of the ore bearing lands, and that the "mining" of manganese is a surface operation, consisting in the removal of overburden and the digging of the exposed ore by means of earth moving machinery such as bulldozers, draglines, and the like, it does not necessarily follow that such a strict construction of the word "mine" is to be used in applying the Miners' Lien Statute. The statute itself provides that it shall be construed as is the regular Mechanics' Lien Statute; and as early as 1869 the Supreme Court of Arkansas in Galbreath v. Davidson, 25 Ark. 490, 493–494, speaking of the construction that should be given to such a statute, said:

"While it is true that this is a statutory proceeding, and cannot be construed to apply remedies beyond the declared intent and meaning of the Legislature, a large majority of the State courts have holden that (mechanics' lien statutes) are meritorious remedial laws, and should have a liberal interpretation. They should be so construed as not to defeat the spirit, true intent and meaning of the acts, and that such laws have been wisely enacted to encourage valuable and permanent improvements, and to secure the industrious mechanic his reasonable reward.

"Such laws were not intended to create liens upon mere personal chattels, but upon lands or things in some manner attached to the realty; not to embarrass commerce, or hinder the ready exchange of purely personal property, but to secure the erection of valuable structures and protect the interests of him who may furnish materials and build the same."

Other Arkansas decisions announcing the same view are: White v. Chaffin, 32 Ark. 59; Buckley v. Taylor, 51 Ark. 302, 11 S.W. 281; Wildwood Amusement Co. v. Stout Lumber Co., supra; and Rea v. Lammers, 212 Ark. 792, 207 S.W.2d 740.

■ Bearing in mind the liberal construction that is to be given the statute, we do not believe that under the circumstances here presented any distinction should be drawn between the ore bearing lands of Westmoreland and the structures that were placed thereon or immediately adjacent thereto, including materials supplied for such structures, whether actually incorporated thereinto or not; and we reject the Government's argument in that connection. A reading of the contract discloses that the mere surface "mining" of manganese ore was not the sole, or even the primary object of the contracting parties; the real purpose of the parties in entering into the contract was the refining of raw ore, and the sale of the refined ore to the Government. In order for that purpose to be accomplished it was necessary that the beneficiation plant and other improvements be constructed; the contemplated operation was a continuous and integrated one, consisting not only of the digging of ore, but also of the transportation of the ore over Westmoreland properties to the plant, and the treatment of such ore. Keeping in view the purpose of the contract, it seems to us that the relationship between the ore body and the beneficiation plant was so

washing and concentrating plant are held by the Court to fall within the language of Section 51–701, it is clear that said lien would cover only the land, the buildings, and appurtenances, * * *. If the mine had been *operated*, then this lien would have extended to the 'other' buildings and appurtenances. However, Westmoreland's mine was never operated * * *. With regard to the quonset building built by Westmoreland to house its business offices and operating shops, we further contend that although it is a 'building', it was not located upon the 'mine' and, further, it was not such 'other building' as was used in 'operating' for the production of manganese since said plant never got into operation." (Government's Final Brief, pp. 40–41 and 43).

intimate and direct, that the latter should be treated as a part of the mine. And, to our mind, the parties to this litigation did, in effect, so treat it during all of the course of the trial.

It may be true, as the Government suggests, that had the beneficiation plant been located at Little Rock, rather than at the mine site, it could not be fairly said that it was a part of the mine or covered by the Miners' Lien Statute. But the case postulated by the Government is not the case before us. The device of supposing an extreme case in order to demonstrate the unsoundness of a legal proposition is a helpful one in many instances, but it does not afford a safe guide for decision in all cases. While the parties might have agreed to construct the plant at Little Rock rather than at Cushman, they did not, in fact, so agree. The statute covers services and materials supplied for use in "equipping" a mine; and it seems to us that the parties here elected to equip the mine proper with a beneficiation plant and the other improvements disclosed by the evidence.

While the case of Salt Lake Hardware Co. v. Chainman Mining & Electric Co., C.C.Nev., 137 F. 632, cannot be said to be directly in point here in view of the difference between the statute there involved and that involved here, and in view of the difference in the problem that was before the Court in that case and the one presented here, nevertheless some of the language contained in the decision is at least persuasive that the improvements on the Westmoreland properties should be considered as a part of the mine, as we do consider them. In that case the Court said:

"* * * It is the duty of the court to consider the object and purpose of the parties in installing the machinery, constructing the mill and improvements on the property, in order to reach a proper interpretation of the law. * * * The mechanic's lien law should be so construed as to protect lien claimants of whatever kind, whether con-tractors, machinists, materialmen, or laborers, in securing their claim. * * * It is to secure this end that courts have held that the lien laws should be liberally construed with a view to effect their object and promote justice. * * *

"In Thompson v. Wise Boy M. & M. Co., [9 Idaho 363] 74 P. 958, 960, where a laborer at work as an amalgamator in a mill situate upon a quartz mine was held to be entitled to a lien on the mine, the court, in its opinion, said:

"'If it be true that the mill was "affixed to the mine, and was a part of the realty," * * * then work in the mill was as much work in the mine as operating a hoist would be work in the mine. * * * The milling of the ore extracted from the mine is as valuable to the mine owner as the extraction of the ore; and where it is milled upon the mine, and in a mill belonging to the mine, we see no more reason for denying the man a lien who works in the mill than for denying such lien to the man who operates the hoist or runs the cars. * * * And we are very strongly inclined to the belief that the Legislature had the one in mind as much as the other when they enacted this law.'

"In Keystone M. Co. v. Gallagher, 5 Colo. 23, 28, the court said:

"'Blodgett's claim is for furnishing material for and building a house or shop contiguous to the mine, and built for the use of the mine under the direction of the mining superintendent. The house was owned by the owners of the mine, and was a part of the mining property, and we see no error in the decree in favor of Blodgett and for the sale of the house, together with the mine, for the purpose of enforcing the lien.'

"In Williams v. Mountaineer G. M. Co., 102 Cal. 134, 142, 34 P. 702, 36 P. 388, it was held, under the lien

law of California, that a claim of lien for materials furnished for the construction of a mill, tramway, boarding house, and reduction works upon a mining claim should be against the mining claim, and not against the specific structure upon the mine. In the course of the opinion, the court said:

" 'The mill is not a mere appurtenance for the mine. It is upon the mining claim, and, like the tunnels, tramways, and roads, is a part of the mine.'

"In Gould v. Wise, 18 Nev. 253, 264, 3 P. 30, 35, the court said:

" 'The last point made is that there was no testimony showing how much of the land upon which the reduction works stood was necessary for its convenient use and occupation. When the reduction works were leased, the land determined by the court as subject to the lien was embraced within the demised premises. And when the defendant acquired the property he purchased this land and the reduction works. This testimony showing that the land and reduction works had been leased together and sold together, tends to prove that the property subject to the liens has been treated as a unit, and used for a common purpose.'

\* \* \* \* \* \*

"In view of the principles announced in these cases, and of all the facts established by the testimony, that the mill in question was erected upon the mining ground owned by the defendant; that the object in view was the erection and construction of the mill for the purpose of working the ores that were to be extracted from the group of mines described in the lien; that the success and usefulness of the mill and of the mine were virtually dependent upon each other, and to that extent, at least, they were bound together for a common purpose—my conclusion is that the entire group of mines as mentioned in the lien and complaint should be held subject to the lien." 137 F. at pages 641–643.

█ Further support for our view is found in 58 C.J.S., Mines and Minerals, § 1(d), pp. 16–17, wherein it is said: "As ordinarily used, the term 'mine' includes the bed or vein of ore into which the pit enters, \* \* \* and the whole series of shafts and subterranean passages and chambers connected with it, and also [includes] all parts of the property of the *mining plant*, on the surface or underground, which contribute, *under one management*, to the mining, and is not limited to mere subterranean excavations or workings." (Emphasis supplied.) The beneficiation plant and the other improvements were all located on lands which Westmoreland purchased with funds advanced by the Government and were certainly a part of Westmoreland's "mining plant", and all of the project was under one management.

Having determined that the improvements on the Westmoreland properties, as well as the ore bearing lands themselves, are covered by the Miners' Lien Statute, we reach the question of priority as between the miners' liens and the Government's mortgages. It will be recalled that in Roberts v. Tice, supra [198 Ark. 397, 129 S.W.2d 262], the Court said, " \* \* \* If laborers and material men perform labor and furnish material to improve a leasehold already covered by a mortgage or other encumbrance, their right to a lien on the improvements is paramount, but not so to the leasehold." Were it not for the "after acquired property" [13] clauses contained in the Government's mortgages, there would be no question that, under the holding in the case last cited, the lien claimants would be entitled to priority as to the improvements. The Government

13. In the phrase "after acquired property clauses" we include Paragraphs A and B of Section I of the supplemental mortgage.

contends, however, that by virtue of the after acquired property clauses the improvements placed upon the properties were covered by the liens of its mortgages, and that such liens related back to the date of the mortgages so as to give it priority. The Government's position in this connection is stated in its final brief, as follows; "The only question of any consequence is whether a mortgage of 'after-acquired' property specifically covers such after-acquired property and is entitled to the same protection as a mortgage of properties already in existence and owned by the mortgagor at the date of the execution thereof. The Government contends that property is as much 'specifically covered' within the meaning of the Tice case under an after-acquired mortgage clause as where said property is identified as presently existing property owned by the mortgagor." (Government's Final Brief, page 44.)

There can be no question that, as a general rule, in cases of mortgages containing after acquired property clauses the liens of such mortgages attach to after acquired property at the time that title thereto vests in the mortgagor; where, however, if the property at the time it comes into the possession or ownership of the mortgagor is burdened with a mechanics or miners' lien, that lien takes priority over the mortgage lien, although actually subsequent thereto in point of time. 36 Am.Jur. "Mechanics' Liens," Section 181, p. 122; 57 C.J.S., Mechanics' Liens, § 201, p. 759. Therefore, if the Government's mortgage liens and the miners' liens came into existence at the same time, the latter would take precedence over the former under the authorities just cited. Cf. Bear Lake & River Waterworks & Irrigation Co. v. Garland, 164 U.S. 1, 19–24, 17 S.Ct. 7, 41 L.Ed. 327.

In resisting the application of the foregoing principle to the instant case, the Government has advanced a number of what appear to us to be highly technical arguments, but has failed to cite any authority to sustain the same.

In view of the liberal construction to be given to the Miners' Lien Statute we do not believe that the rights of the parties should depend upon highly technical considerations or upon any finely drawn distinctions. Not only is the Miners' Lien Statute to be liberally construed, but it should be given a practical construction, and one which will do justice as between the parties and prevent unjust enrichment. After all, it must be kept in mind that but for the services and materials supplied by the lien claimants, and others, there would be no improvements upon the property.

The Government first contends that its liens, by virtue of the after acquired property clauses, related back to the time that the mortgages were filed, whereas, as it contends, the liens of the suppliers had their inception at the time that their materials were delivered at the site. We are not so sure that a mortgagee's lien on after acquired property relates back to the time of the recordation of the mortgage; we have found no authority to that effect, and, on the contrary, in 59 C.J.S., Mortgages, § 185(b), p. 241, it is said that the lien of a mortgage can attach to after acquired property only in the condition in which it comes into the mortgagor's hands; in § 210 of the same Chapter, page 276, it is said that where one executes a mortgage on property which he does not then own, but to which he subsequently acquires title, the mortgage attaches from the time that title is acquired. Nothing is said about "relation back" in either section. Assuming, however, that there is such a "relation back", the same is a fiction and should not be indulged in so as to defeat the rights of suppliers who furnished the very materials to which the mortgagee's liens attached. As was said in the Bear Lake case, supra, " * * the actual fact will be considered, and not the fiction." 164 U.S. at page 23, 17 S.Ct. at page 13.

It is next contended that when Westmoreland acquired title to the materials furnished by the suppliers, the Government's mortgage liens became

perfected, whereas the liens of the suppliers were inchoate until such later time as the latter took the statutory steps to perfect such liens. The priority of a mechanic's lien under Arkansas law, however, does not depend upon the quality of the lien as "choate" or "inchoate," but rather upon the time at which the lien attaches, which is when the first materials are furnished. See Franks v. Wood, 217 Ark. 10, 13–14, 228 S.W.2d 480.

The Government suggests that title to the materials supplied by the lien claimants vested in Westmoreland or in it [14] prior to the time that such materials were delivered to the Westmoreland properties, and for that reason the mortgage liens attached prior to the inception of the miners' liens; we do not agree. In the first place, we are not satisfied that the lien of a materialman under Ark.Stats. Section 51–701 does not arise until actual delivery at the mine site. In Estep v. Blue Ribbon Coal Co., supra, 177 Ark. at page 86, 9 S.W.2d at page 332, it was said that the statutory lien for materials could not have its inception "before the material and supplies were begun to be furnished"; nothing is said about delivery at the mine site; as a matter of fact, the Court was apparently not there concerned with the claims of materialmen at all, but solely with labor claims; it would seem reasonable that the materialmen here "furnished" Westmoreland with the materials when they delivered the same to Westmoreland; clearly, the materials were furnished for use in constructing the improvements. In Superior Oil Co. v. Etheridge, supra, 219 Ark. at page 297, footnote 6, 242 S.W.2d at page 722, the Court said: "When we say 'pipe on the drill site', we do not refer to some casing that was never unloaded on the drill site. Pipe in transit and never on the drill site was not subject to the lien; * * *." As the Government points out in another connection, however, the Court in the Etheridge case was not concerned with priorities; and, furthermore, the pipe referred to in the footnote which has been quoted was never delivered on the lease; here, all of the materials were delivered. But aside from that, and granting the Government's premises as to the time of inception of the miners' liens, we feel that to allow the Government's conclusion as to priority would be to take a hypertechnical view of the statute that would be contrary to its beneficial intent and purpose, and we are unwilling to do so.

With particular regard to Latrobe Construction Company, which supplied labor for the construction of the plant, and with regard to Bragg's Electric Construction Company to the extent that it supplied labor, as opposed to materials, the Government argues that at the time their work was done, the Government's liens had already attached to the improvements and materials upon which they worked, and that, regardless of the priority accorded to the other lien claims, their particular claims should be denied priority. This attempted distinction between Latrobe and Bragg's, on the one hand, and the other lien claimants, on the other, is so highly technical and, to our mind, so inequitable and without basis in reason that we are unwilling to draw it.

Nor do we attach significance to the fact that under the provisions of Ark.Stats., Section 51–1006, the "legal title" to the materials furnished may have been in the Government rather than in Westmoreland. Such title was in the Government, if at all, only for security purposes; the property was actually sold to Westmoreland, and it was Westmoreland's property, subject to the liens of the Government.

It is still further argued by the Government that in no event should the lien of a particular claimant be extended beyond "the particular part of the building or structure on which he work-

14. Ark.Stats. § 51–1006 provides that in the absence of a stipulation to the contrary, the mortgagee of personal property shall have the legal title thereto and the right of possession.

ed or upon the particular part of such building created out of the materials supplied by said lien claimant," (Government's Final Brief, page 47); in the alternative it is urged that if it be held that a lien claimant's lien extends to the entire building on which he worked or for which he supplied materials, such lien could not apply to any other buildings or structures erected "prior to the date of the commencement of said claimant's lien," (Ibid., pp. 47–48.) As stated, no authority is cited in support of those contentions, and we reject them.

It must be remembered that the statute now under discussion must be given a practical construction, and to try to draw all of the distinctions suggested by the Government in the arguments just mentioned would be highly impractical and would render the statute unworkable in a case of this magnitude. Those arguments ignore the fact that all of the improvements with which we are here concerned were constructed as part of one integrated project, and we feel that all of those structures should be regarded as a unit for the purpose of determining priority. Of course, when the question of sale arises, it will be obviously desirable to sell the individual improvements separately.

The Government further argues that the lien of any supplier of materials incorporated into the real estate should be held to be prior to the Government's mortgage on the land only if the property could be removed "without injury." We cannot agree with that contention. When the Miners' Lien Statute is read in connection with Section 51–605, it is obvious that it contemplates that the improvements shall be severed and removed from the land, and such land certainly will not be damaged by the removal. Naturally, there are probably certain parts of these improvements, such as concrete foundations, which cannot, from a practical standpoint, be removed and as to such particulars the lien claimants will have no priority. The case, Imboden v. Citizens Bank, supra, referred to by the Government in this connection is not applicable here. In that case the Court was concerned with an extension to an existing improvement which could not be removed therefrom without damage thereto. We do not understand that any of the improvements involved in this case are connected in any way with any of the improvements that were in existence on the Westmoreland properties at the time of the Government's mortgage. We are here concerned with entirely new construction.

Our determination that the lien claimants are entitled to priority as to improvements constructed by Westmoreland after the date of the Government's mortgages by virtue of the provisions of the Miners' Lien Statute, which is broader than the Mechanics' Lien Statute, actually renders it unnecessary for us to discuss the question of priority as to such improvements under said last mentioned enactment. In the interest of completeness, however, we feel that we should state that it is our opinion that the Government would be entitled to priority under that statute as to such improvements, to the extent of the moneys advanced for construction purposes, by reason of the proviso contained in Section 51–605, which has been quoted. It should be noted that in determining the Government's priority as to improvements under the mechanics' lien law we do not extend that priority to the $418,-600 which the Government advanced for land purchase, but limit it to the amount advanced for construction purposes; the propriety of this course was suggested in the Government's final brief. Of course, the Government has priority with respect to the $418,600 advance under the prior mortgage provision of the Mechanics' Lien Statute, as far as the land itself is concerned. This view of the matter eliminates any necessity of a lengthy and detailed consideration of the several opinions rendered in the case of Ashdown Hardware Co. v. Hughes, supra, and of any effort on our part to reconcile the divergent views expressed in that case.

In determining how much of the Government's claim should be allowed priority with respect to the improvements on the property, we accept the testimony of Mr. E. H. Moore, who was Chief Accountant for Westmoreland; Mr. Moore no longer has any connection with Westmoreland or with any of the creditors; he was not cross-examined, nor was his testimony contradicted. Mr. Moore testified from a flow sheet that he had prepared showing conditions as they existed on March 31, 1953. While he did not testify as to how much money the Government had "advanced" for construction purposes, he did testify as to expenditures that Westmoreland had made which we consider to be properly allocable to construction. He stated that $95,000 had been expended as fees for the engineering firm employed by Westmoreland to supervise the work; that $956,676.47 had been spent for building the washing and concentrating plant shown in Category #2 on the flow sheet; that out of an item of $40,835.31, appearing on the flow sheet as "Freight and Erection," roughly $17,-700 represented freight on mining and hauling equipment, leaving a balance of $23,135.31 allocable to freight on material and supplies used in construction; that $313.65 was spent for building a certain road or for engineering services in connection with said road, and that $407.61 was spent for the construction of a movable field office for the mining superintendent. His figures for construction total $1,075,533.04. In its final brief the Government states that $1,122,-531.48 was "advanced" by the Government for construction purposes, and that $1,072,404.81 was actually "expended" for that purpose. It will thus be seen that there is a very close correlation between the Government's figures on actual construction expenditures and those testified to by Mr. Moore, the difference being only $3,128.23, which difference under the circumstances presented here we deem to be immaterial. Now, it is true that the Government's priority under Section 51–605 is to be determined by the amount of money which it advanced for construction purposes, rather than by the amount that Westmoreland spent for such purposes; but the difference between what the Government says was advanced and what Mr. Moore said was spent is only $46,998.44, a comparatively small figure in this lawsuit; and it must be remembered that pursuant to Amendment No. 1 to the original contract the Government recouped from Westmoreland's bank account the sum of $119,230.31. We feel, therefore, that substantial justice would be done by a determination that the Government's priority under Section 51–605 with respect to the improvements would amount to the $1,075,533.04 testified to by Mr. Moore.

As to the personal property furnished by several of the lien claimants and not incorporated into the work, we are satisfied that each of such claimants is entitled by virtue of the Miners' Lien Statute to a lien superior to those of the Government on such personal property as he himself furnished, but not as to the personal property furnished by others. Bennett v. Weis, supra. With respect to personal property not incorporated into the improvements and not furnished by any of the lien claimants, we hold that none of those claimants has any lien whatever upon such property under either the Mechanics' Lien Statute or the Miners' Lien Statute.

This brings us to a consideration of the prayer of the judgment creditors for leave to levy executions upon certain of the automotive equipment, belonging to Westmoreland and described in the respective answers of those creditors, which levy, if permitted, they contend will entitle them to the benefits of Section 60 of Act 142 of 1949, Ark.Stats. § 75–160, and will give them execution liens on such vehicles superior to the mortgage liens of the Government.

Act 142 of 1949 is the Arkansas version of the "Uniform Motor Vehicle Administration, Registration Certificate of Title and Anti-theft Act"; it is a comprehensive statute, consisting of ninety-

four sections, grouped into twelve separate articles. Subsection (a) of Section 60 of said Act provides that: "No conditional sale contract, conditional lease, chattel mortgage, or other lien or encumbrance or title retention instrument upon a registered vehicle, other than a lien dependent upon possession, is valid as against the creditors of an owner acquiring a lien by levy or attachment or subsequent purchasers or encumbrances with or without notice until the requirements of this article [have] been.complied with." It is further provided that a certified copy of a title retaining contract or lien instrument affecting a vehicle covered by the Act shall be filed with the Arkansas State Revenue Commissioner, and that the existence of such lien shall be noted on the title certificate; and, further, that the Commissioner shall maintain an appropriate index of all lien, encumbrance or title retaining instruments filed with him. Act 142 of 1949, Sections 60(b, d, e, f). Section 61 of the Act provides that the filing of a certified copy of a lien instrument, and the issuance of a new title certificate evidencing such lien shall be constructive notice of all liens and encumbrances against the vehicle in question, as far as creditors of the owner and subsequent purchasers or encumbrancers, except those holding liens dependent upon possession, are concerned; and further provides that such method of giving notice of such liens or encumbrances shall be exclusive. It has been stipulated in the instant case that the Government has never filed, or caused to be filed, copies of its original mortgage or of its supplemental mortgage with the Arkansas State Revenue Department.

It is the theory of the judgment creditors that Act 142 is applicable to the vehicles described in their respective answers, and that there was no compliance by the Government or Westmoreland with the requirements of Section 60 of said Act; that they obtained their several judgments, and in due course would have had executions issued and levied upon said vehicles, but that they were prevented from doing so by the fact that on January 22, 1954 we appointed a receiver to take charge of the assets of Westmoreland and to preserve them pendente lite; they contend that had such writs been issued and levies made, they would have become entitled to the benefits of Section 60(a) of Act 142, and that their execution liens would have been superior to the Government's mortgage liens. As indicated, they now ask us to permit them to have executions levied on said vehicles, notwithstanding the receivership.

In answer to those contentions, the Government takes the position that the permission sought by the judgment creditors should not be granted; and it argues further that even if we should grant said prayer and permit levies on the equipment in question, the execution liens would still be inferior to the Government's mortgage liens.

In taking up the respective contentions just mentioned it should be borne in mind that we are not here concerned with any question of the relative priorities of existing liens, as far as the judgment creditors are concerned. None of those creditors contends that at the present time he has any lien on any of Westmoreland's vehicles which is superior to the liens held by the Government. What said creditors are asking us to do is to permit them, after the Government commenced action to foreclose its mortgages, unquestionably good as between the parties thereto, to obtain liens on the vehicles in question by levy of execution thereon, and then to hold that the liens so obtained are superior to those of the Government. In other words they are now seeking to employ, subsequent to the commencement of this action, legal process and remedies so as to improve the position occupied by them at the time the suit was filed. We do not think that this should be allowed.

In the early Arkansas case of Hornor v. Hanks, 22 Ark. 572, Hanks brought an action for the partition of certain lands; Russell, a defendant, had previously obtained a judgment against Hanks in fed-

eral court, and after the commencement of the partition suit, obtained a sale of the lands involved under an execution based upon his federal court judgment; Russell bid in the lands at the sale and attempted to set up the title thereby obtained as a bar to Hanks' action for partition. In holding that this could not be done the Court said:

> "The law is expressly written that the right of a plaintiff must be adjudicated upon as it existed at the time of the filing of his bill * * *. And this court has decided that where a bill disclosed a good cause of action but which had not accrued when the bill was filed, the bill could not be maintained. Phebe v̄. Quillin, 21 Ark. 490, 499. And it would seem to be against the policy of a court of chancery to allow a defendant to cut off, or to modify the relief to which the whole case may show the plaintiff to have been entitled upon the condition of the case when the suit was begun, by the use of legal process or remedies after the defendant is brought into a court of equity, there to make his defense. For the object of a chancery suit is to administer entire justice, by a settlement of the whole controversy between all the persons affected by it, and this it can do only by engrossing the consideration of all the points of prosecution and defense that may be allowed to the respective parties. Hence Russell would have done well to have defended the bill of Hanks upon its deficiencies, and his own rights, as they were when the bill and his answer were filed. He could not, of course, have been deprived of any benefit that might attach to his levy of the lands made before the beginning of this suit; neither, on the other hand, does it follow that his execution sale against Hanks can assist his defense here * * *". 22 Ark. at page 580–581.

Hornor v. Hanks has been cited with approval in a number of later Arkansas cases, the most recent being Massey v. Tyra, 217 Ark. 970, 234 S.W.2d 759.

We have examined the cases cited by the judgment creditors on this phase of the case; and while they recognize the propriety in certain instances of permitting a levy of execution on property in the hands of a receiver, none of them goes so far as the judgment creditor's would have us go here. As a matter of fact in Coe v. Columbus, Piqua & Indiana R. Co., 10 Ohio St. 372, 75 Am.Dec. 518, 540–543, cited by the judgment creditors, the court considered a levy of execution on behalf of a judgment creditor upon property in the hands of a receiver to be good against the debtor, but not as against a mortgagee, even though the mortgage was defectively acknowledged; the view was taken that the mortgage was good as between the parties, and that a court of equity would have directed that it be perfected. It was said: "There was, then, a lis pendens which a subsequent claim could not defeat." The Court also took the position that the possession of the receiver was, in effect, the possession of the mortgagee. As we have said, the Government's mortgages were unquestionably good as between the parties, as far as the motor vehicles were concerned, and there is no more reason to permit the judgment creditors to perfect their liens on such vehicles so as to gain priority with respect thereto than there is to permit the Government to comply, or force Westmoreland to comply, with Act 142 of 1949, Ark.Stats. § 75–101 et seq., assuming that said statute is applicable here.

██ But aside from the foregoing, it seems to us that in view of the relief sought by the judgment creditors, the burden is upon them to establish the applicability to this case of Act 142, and, if that statute be applicable, then to further establish that we should, in the exercise of our discretion, permit the levies

to be made.[15] And we feel that said creditors have failed to discharge their burden in both of the respects just mentioned.

Assuming for the moment that the several vehicles described in the answers of the judgment creditors are such as would normally be "subject to registration" under Act 142, a reading of Section 60(a) of said Act discloses that it does not apply to vehicles that are merely "subject to registration" but only to such vehicles as are actually "registered" under the Act. While the Act does not require that certificates of title be renewed annually, certificates of registration must be so renewed, Act 142 of 1949, Sections 40–44; hence, a motor vehicle may be registered at one time and not registered at another time. As we construe Section 60(a), in order for a judgment creditor to obtain the benefit thereof, as against a mortgagee, it must appear that the vehicle in question was, in fact, registered at the time such creditors obtained a levy of execution thereon. In the instant case there is no evidence that any of the vehicles in question are registered now, or that they were so registered when the suit was filed, or when the receiver was appointed, or when the judgment creditors filed their answers containing the prayer for relief which is now under discussion.

It is true that counsel for the Government state in their brief that, "The receiver in this case has registered those vehicles which the law requires him to register * * *." (Government's Final Brief, p. 33) But such vehicles are not identified in any manner, and we have no means whereby we can identify them. It is also true that Mr. E. H. Moore, to whom we have previously referred, identified certain expenditures of Westmoreland as representing license fees on some of its automotive equipment; it appears, however, that those expenditures were made in July and August of 1952, whereas this suit was not commenced until January, 1954; and, of course, we cannot from Mr. Moore's testimony identify the particular vehicles upon which license fees were paid.

Not only have the judgment creditors failed to show that such vehicles are now registered under the Act or were so registered at any other particular time, but, on the other hand, the record in the case and the evidence that we have heard has shown that at all times pertinent hereto at least the great majority of such vehicles was not even "subject to registration". A motor vehicle is not required to be registered unless it is actually "driven or moved upon a highway", Act 142 of 1949, Section 32; and even if it be conceded that all of the vehicles described in the answers of the judgment creditors were adapted for operation on highways and that such was their contemplated use, the fact remains that after the execution of Amendment No. 1 to the original contract, which occurred on April 2, 1953, operations at the Westmoreland project were closed down and the equipment taken out of use. Since the filing of the suit, it seems clear that none of the vehicles has been driven upon the highways with the possible exception of one or two that may have been used from time to time by the receiver; but, as stated, such vehicles are not identifiable from the evidence. It is also clear that for a number of months prior to the commencement of this action, the vehicles were, by and large, out of use.

15. With regard to the case of West v. General Contract Purchase Corporation, 221 Ark. 33, 252 S.W.2d 405, discussed in the briefs, it should be said that in that case the Court was called upon to determine the relative priority of a conditional sale contract and a valid and existing execution lien on a vehicle that had actually been seized by the sheriff; and it was held in such case that the conditional vendor was required to show that it had complied with Act 142 of 1949. In the instant case, however, the judgment creditors have no liens on the Westmoreland's motor vehicles; they are asking us to permit them to acquire liens and then to award priority to the same; and under such circumstances, as stated, we feel that the burden is upon them to show that they are entitled to such relief.

948

Even if we were convinced, however, that Act 142 is applicable here, still the judgment creditors in our estimation have failed to establish that we should permit them to levy executions on the automotive equipment. We have already considered and rejected the "equitable contentions" advanced by the creditors in general, and we see no particular equities in favor of the judgment creditors which would move us to grant them the relief that they seek. On the contrary, we think that the equities are the other way.

The creditors who obtained their judgments prior to the filing of this suit apparently relied upon the liens of their judgments upon the Westmoreland real estate, and took no action toward obtaining liens on the personalty until after the Government had filed its suit to foreclose its liens, and had had the property seized by a receiver appointed by this court. The receiver has had this property in his possession for months, caring for and guarding the same, and expending substantial sums of money upon it, particularly upon the motorized equipment, all at the Government's expense, or at least with moneys advanced by the Government, which moneys it will, in all probability, never recover.

Equity favors the diligent and not those who sleep on their rights; the creditors who obtained judgments prior to the filing of this suit had ample time to have writs of execution issued and levied, but they failed to do so. The creditors who did not obtain their judgments until after this suit was filed have been, in our eyes, even more dilatory and stand on a less favorable footing from an equitable standpoint than those who at least reduced their claims to judgment before the institution of this action.

Under the circumstances revealed here, we would deem it most inequitable to give the judgment creditors the relief they seek. None of their money went into this equipment, nor did they supply any of it; on the other hand, said equipment, with the exception of the jeep that has been mentioned, was bought and paid for with funds advanced by the Government, and the jeep itself was part of the security upon which the Government relied, and was specifically described in the original mortgage. Moreover, there is no showing here that any of the judgment creditors searched the records of the Arkansas State Revenue Department prior to extending credit to Westmoreland, or that any of them actually relied upon the fact that Act 142 had not been complied with. We, accordingly, decline to permit them at this time to levy execution on the automotive equipment; that means that, as far as personalty is concerned, they will be treated simply as unsecured creditors. Of course, their judgments are liens on the Westmoreland lands located in Independence County, and are also liens on such lands located in Izard County to the extent that said judgments are docketed in that county; but said liens are inferior to those of the Government and to those of the lien claimants.

To summarize, we hold that the mortgage liens of the Government are superior to the claims of all creditors, as far as the lands of Westmoreland and the improvements existing thereon as of the date of the Government's mortgages are concerned; this priority as to this category of property extends to the full amount of the Government's claim for which it is entitled to judgment against Westmoreland. Next in order come the miners' liens of the lien claimants; third in line are the liens of the judgment creditors to the extent that their judgments are liens. At the bottom of the order of priority are the claims of the unsecured creditors.

As to the improvements erected upon the Westmoreland lands subsequent to the Government's mortgages, and which have become appurtenant to the land, the claims of the lien holders under the Miners' Lien Statute are entitled to priority over the mortgage liens of the Government and the judgment liens, which latter two classes of liens take priority, as between themselves, in the order mentioned. Finally come the claims of the unsecured creditors, which, when reduced to judgment, will, as a class,

constitute fourth liens on the Westmoreland lands and improvements thereon.

As to particular items of personal property furnished by particular lien claimants, which have not been incorporated into the improvements so as to become appurtenant to the land, and which are identifiable, the individual lien claimants furnishing such items are entitled to priority with respect thereto under the Miners' Lien Statute, as against the Government, the mortgage liens of which will be second liens as to such items. No lien claimant, however, is entitled to any lien on any item of personal property not furnished by him.

As to items of personal property not furnished by any of the lien claimants and which have not been incorporated into the improvements so as to become appurtenant to the land, the Government's mortgage liens are superior to all of the other claims.

A foreclosure sale of all of the Westmoreland properties will be decreed, and the proceeds of such sale will be distributed in accordance with the relative priorities heretofore declared. Before concluding this memorandum we will comment briefly on the question of how this property should be sold:

It goes without saying that the properties should be sold in such a manner as to produce the highest possible return and so as to protect, insofar as possible, the legitimate rights and interests of the several classes of creditors, although from a practical standpoint it must be recognized that it is practically inevitable that both the Government and the lien claimants will sustain severe loss, and the probabilities are, to put it mildly, that the judgment creditors now existing, and the unsecured creditors who will become judgment creditors as a result of the instant proceedings will probably realize nothing from the sale. Moreover, since the Government has liens on items of personal property with respect to which none of the creditors have any lien claims, it seems equitable that Westmoreland's assets be, in effect, marshalled.

To achieve the results just mentioned, insofar as they can be achieved, we feel that there should first be sold the personal property upon which the Government has liens but with respect to which the other creditors have none. In view of the nature of this property, consisting principally of mining and hauling equipment, it should be sold item by item, and a record made of the amount for which each item is struck off. We include in this category the automotive equipment that has been discussed; with particular regard to the Euclid dump trucks, however, should any bidder manifest an interest in bidding for those vehicles as a group, they should be offered on that basis after they have first been offered one by one, and the bid or bids should be accepted which will produce the highest return. The proceeds of the sale of such personal property should be credited against the amount of the Government's claim.

There should next be offered the identifiable personal property furnished by particular lien claimants, each lot being offered separately. The proceeds of the sale of each lot should be credited against the claim of the particular supplier who furnished such property.

Thereafter the improvements on the Westmoreland properties, constructed subsequent to the execution of the Government's mortgages, should be sold, each improvement being offered separately. The proceeds derived from the sale of the improvements should be credited upon the judgments of the respective lien claimants, all of them sharing pro rata. The purchaser or purchasers of the improvements will have the right to remove the same, or such portions thereof as are removable, within a reasonable time after confirmation, and we feel that six months would be a reasonable time. In the unlikely event that the proceeds of the sale of the improvements are more than enough to satisfy the judgments of the lien claimants, the balance should be credited against the Government's judgment.

Finally, the lands and improvements thereon existing at the time of the Gov-

ernment's mortgages should be sold, and the proceeds of such sale credited against the Government's judgment. Should such proceeds be more than sufficient to liquidate the Government's claim in full, together with all costs, then the overplus should be applied in accordance with the order of priority heretofore established.

Let a decree be entered in accordance with this memorandum and in accordance with the memorandum heretofore filed dealing with the controversy between the Government and Westmoreland. We feel that this decree should be drafted by the United States Attorney after full consultation, or consultations, with the receiver, who is thoroughly familiar with the properties involved, and who will be appointed as special master to make the sale of such properties. After the decree has been drafted, it should be promptly presented to the Court for approval. We feel that ten days from this date should be sufficient to enable the United States Attorney to draft and present the decree, in view of the fact that the receiver has prepared a comprehensive inventory of the property involved.